633 So.2d 407 (1993)
Robert SIMON, Jr.
v.
STATE of Mississippi.
No. 90-KA-0904.
Supreme Court of Mississippi.
September 30, 1993.
Rehearing Denied March 17, 1994.
Clive A. Stafford Smith, New Orleans, LA, Johnnie E. Walls, Jr., Walls Law Firm, Greenville, for appellant.
Michael C. Moore, Atty. Gen., W. Glenn Watts, Sp. Asst. Atty. Gen., Jackson, for appellee.
EN BANC.
HAWKINS, Chief Justice, for the Court:
Robert Simon, Jr., was arrested February 3, 1990, in Clarksdale, and was charged with the February 2 capital murder (committed in the course of arson), sexual battery, and kidnapping of nine-year-old Charlotte Parker of Quitman County. Simon was indicted by a Quitman County grand jury March 12, 1990.
A motion for change of venue was granted on June 5, and the trial was moved to Jones County. A six-day trial was held June 18-23, 1990, with a jury picked from a venire from both the first and second districts of Jones County. Simon was found guilty on all three counts; but, after a separate sentencing hearing, the jury was unable to reach a unanimous verdict as to the imposition of the death penalty.
Simon was sentenced to consecutive terms of life imprisonment, thirty (30) years, and thirty (30) years in the custody of the MDOC.
On appeal, Simon alleges numerous assignments of error, but we find only three merit discussion. Finding no error, we affirm.

FACTS
About 9:15 p.m. on February 2, 1990, Carl Parker, his wife, and their two children returned *408 to their home on Highway 322 in Quitman County. The Parkers had been attending a service at the Riverside Baptist Church near Marks.
Approximately two hours later, around 11:15 p.m., the Lambert Volunteer Fire Department was called by a neighbor, Billy King, to a fire at the Parker residence. Fireman Jerry Wages noticed the southwest corner of the house was more badly burned than the rest of the house. Wages found the back door unlocked and crawled into the house.
Inside, he found the bodies of Carl Parker and his son, Gregory, bound by the feet, ankles, and wrists. He also found the body of nine-year-old Charlotte Parker. She was undressed from the waist down and had a ribbon tied around her wrist. She also had a wound on her hip. The body of Mrs. Parker was later also found in the house.
The Quitman County sheriff and coroner supervised the removal of the bodies from the burned home. Sheriff Harrison noticed that Carl, Gregory, and Charlotte Parker had all been bound; and Charlotte had been shot in the back.
During the fire department's attempt to put out the fire at the Parker house, one of the Parker's neighbors noticed that Carl Parker's truck was missing. Sheriff Harrison then radioed all officers in the area to be on the lookout for Parker's Chevrolet Silverado truck.
Billy King had also seen two sets of headlights coming down the driveway from the Parker's house while he was calling the fire department. He saw two vehicles turn out of Parker's driveway and head toward Clarksdale.
Joe McCullough had been going east on Highway 322 about the same time King was reporting the fire. He remembered meeting two vehicles  the first, a Silverado truck  and both vehicles were going very fast toward Clarksdale.
Eddie Lee Spralls was watching television in his Clarksdale home that night. About midnight he heard noises outside, and when he looked out a window, he saw a truck backing between two abandoned houses. He called the Clarksdale police.
Clarksdale police officers arrived at the alley behind Spralls' house and put a spotlight on the truck. Two black males jumped out of the truck and ran toward Highway 61. The two fleeing men had abandoned Parker's truck near the home of Simon's mother-in-law, where Simon's wife was spending the night.
The truck was later identified as being that of Carl Parker, and it was full of furniture and household items from the Parker residence. A pillowcase found near the truck contained two revolvers  one of which had two live shells left in it  as well as other items belonging to the Parkers.
The next day, Coahoma County Sheriff Andrew Thompson, Jr., received a tip from a caller which led him, Bill Ellis and Ken Dickerson, investigators for the Mississippi Highway Patrol, to a dumpster near the house of Simon's mother-in-law in Clarksdale. Dickerson recovered a pair of coveralls and a pair of work gloves from the dumpster. The clothes were wet and smelled of smoke. At trial, Dean Parker (Carl's son and half-brother to Gregory and Charlotte, who no longer lived in Carl's house) said that the gloves were the same type his father used for work.
After pursuing the lead provided by the caller and finding the information reliable, Sheriff Thompson passed information along to Quitman County Sheriff Harrison. Harrison obtained two arrest warrants for Anthony Carr and Simon and took them to the Coahoma County sheriff. Simon and Carr were arrested at approximately 3:30 p.m. on Saturday, February 3, 1990, in Clarksdale.[1]
Later that day, with the consent of Simon's wife, investigators searched Simon's Memphis apartment. They found a man's and a woman's wedding ring, an antique pocket watch, a pellet gun, a pair of boots, bullets for a rare caliber revolver, a notebook with *409 "Mr. Parker" written on it, and other items. All were identified by either Dean Parker, Carl Parker's older son, or E.C. Parker, Carl's father. The two wedding rings were also identified by a jeweler, who had done work on them, as belonging to the Parkers.
After his arrest on Saturday, Simon was given his Miranda warnings and held in the Clarksdale City jail. On Sunday, February 4, he was moved to the Quitman County jail. On Monday, at about 10:30 a.m., Officer Dickerson read Simon his Miranda rights and Dickerson, Officer Billy Eglis, Deputy Hunter and Sheriff Harrison questioned Simon.
Simon's alleged statement was unrecorded. However, all of the officers present at the questioning testified that Simon said he understood his rights and did not want an attorney. They also said that he waived his right of silence and told them that he had killed the Parkers. When the officers presented Simon with a waiver form, he refused to sign. One of the officers noted on the form, "Understands but prefers not to sign and waives."
Simon later moved to suppress his statements, contending he did not waive his rights voluntarily. At the pre-trial suppression hearing, Simon testified he had requested an attorney when he talked to one of the jailers; however, he could not identify the jailer to whom he made the alleged request. He did admit that he had been read his Miranda rights, both when he was arrested on Saturday and, again, before he talked to the officers on Monday. Simon did not deny making the statement about killing the Parkers to the officers; however, he said he had made it up.
Three inmates of the Quitman County jail testified Simon had made statements to them that he had been involved in the Parker murders, the rape of Charlotte Parker, and in the burning of the Parker house. Simon admitted talking to A.J. Jones, a cellmate; however, Simon denied talking about the Parker case.
Counsel for Simon asked the court to provide adequate funds for a psychologist to evaluate Simon and make a full psychological report to the court. The court granted the defense motion, and the trial judge reserved ruling on the admissibility of the statements by Simon until the psychologist completed his report.
The report of Dr. Kallman, the psychologist hired by the defense, was not available until after the trial had started. However, Dr. Kallman provided a preliminary report to defense counsel the night before the trial started.
The final ruling on Simon's motion to suppress his statements was made after the court had read and considered the report of Dr. Kallman. The trial court ruled Simon's statement to the police officers was freely and voluntarily made and was admissible. The statement was admitted at trial.
Dr. Steve Hayne, a forensic medical specialist, performed an autopsy on Charlotte Parker's body. He found she had been sexually assaulted anally and vaginally, as well as having been shot more than once at close range. The cause of her death, however, was smoke inhalation, rather than the gunshot wounds. One of the bullets was removed from her body and sent to the Mississippi State Crime Laboratory for analysis.
During Simon's trial, the State introduced forensic evidence showing that the handgun found near Parker's truck in Clarksdale was the same gun that had been used to fire the bullet removed from Charlotte Parker's body. Test results also showed the inside front of a pair of Simon's shorts tested positive for the presence of feces.
Deputy Fire Marshall Charles Neal testified the fire in the Parker home had started in the master bedroom. He also stated that, in his opinion, the fire was arson. He noted the melted bedsprings, which indicated a high temperature fire, as well as a metal bucket in the room. No scientific tests to identify an accelerant were performed, however, because of the intense rain that had fallen the night of the fire.
A jury composed of two African-Americans and ten whites, five males and seven females, convicted Simon on all three charges. Simon appeals, with twenty-two assignments *410 of error. Finding no merit to any of the alleged errors, we affirm.

THE LAW

I. BATSON VIOLATION?
In Batson v. Kentucky, the U.S. Supreme Court set forth the rule that a criminal defendant has a right to be tried by a jury selected without regard to race. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). This Court has held,
It is thus clear under Batson's express terms that a defendant raising a Batson claim must show
1. That he is a member of a "cognizable racial group";
2. [t]hat the prosecutor has exercised peremptory challenges toward the elimination of veniremen of his race, and
3. [t]hat facts and circumstances infer [sic] that the prosecutor used his peremptory challenges for the purpose of striking minorities.
Lockett v. State, 517 So.2d 1346, 1349 (Miss. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988).
In Lockett, we also noted "Batson states that `ordinarily,' a reviewing court should give the trial court `great deference.'" Id. (quoting from Batson v. Kentucky, 476 U.S. 79 at 98, 106 S.Ct. 1712 at 1724, 90 L.Ed.2d 69 at 89 (1986)). In Lockett we continued,
We today follow the lead of other courts who have considered this issue and hold that a trial judge's factual findings relative to a prosecutor's use of peremptory challenges on minority persons are to be accorded great deference and will not be reversed unless they appear clearly erroneous or against the overwhelming weight of the evidence.
Lockett, 517 So.2d at 1350.
Appendix I to Lockett contained numerous examples of acceptable race-neutral reasons for striking a juror. One example given was "age." Id. at 1356.
During jury selection, Simon made an objection to the prosecutor's use of peremptory challenges, citing Batson. First, the judge noted that Simon, an African-American, was a member of a "cognizable racial group." Second, the trial judge recognized that the prosecutor had used three peremptory challenges to exclude veniremen of Simon's race. And, last, the judge found that the facts and circumstances could indicate the prosecutor was using his peremptories for the purpose of striking minorities, therefore justifying the Batson challenge.
The State's first two peremptory challenges excluding African-Americans were used against jurors who had stated unequivocally they were opposed to the death penalty. The trial judge accepted that as clearly being an acceptable race-neutral reason for their being stricken by the State. Simon does not question the judge's decision in their cases. He challenges only the trial judge's finding of an acceptable race-neutral reason for the prosecutor's use of a peremptory challenge against Juror Larry Prince.
However, regarding Prince, the following exchange took place:
MR. MELLEN (Prosecuting Attorney):
[W]e saw that the defense was striking all the white males, systematically excluding them and did that... . Seeing what they were doing there, then it was a strategy which the State picked up on, having accepted these others anyway by that time, and we then struck Larry Prince, who was 39, and some women which were  which were there. I think that we've got a right to see what is taking place with the defense and their strategy of picking a jury, and we've certainly got a right, and it's articulable to select a cross-section, and that was our intent to do that. Now, Your Honor, when we struck these individuals, we came out with 43 as a white male who would be serving on the jury and was not struck, and that's because the defense had then used up all his challenges.
JUDGE PEARSON:
Are you giving that as your reason for having struck Mr. Prince?
MR. MELLEN:
Yes, sir, and that would be Mr. Prince... .

*411 JUDGE PEARSON:
... [I]n order to reach Mr. Atwood because of the  there was a strategic move on your part in order to get one white male on the jury; is that correct?
MR. MELLEN:
Or at least to get this white male on the jury because of the strategy, combating the strategy that had been exhibited by the defense, and he was an older man and that's what  (emphasis added)
.....
JUDGE PEARSON:
The court, as far as Mr. Prince is concerned, feels that the State is not  hands are not totally tied to making some decisions as to who they would strike or not strike in order to reach other jurors who they may think would be better or more suitable jurors regardless of the defense's strategy or of the State's desires so long as they are doing it for a strategic purpose in order to obtain the juror that they would  as stated by Mr. Mellen, would be a juror which would be more desirable to the State than the one that they struck.
The trial judge found the State's reason for striking Prince  to get Mr. Atwood, an older man, on the jury  was an acceptable race-neutral reason. This finding is not in violation of Batson.

II. PEREMPTORY CHALLENGES OF WOMEN
There is no merit to Simon's claim that the State was required to give a "gender-neutral" reason for peremptorily challenging women. The Equal Protection Clause does not extend to gender. United States v. Hamilton, 850 F.2d 1038, 1042 (4th Cir.1988). But see United States v. DeGross, 913 F.2d 1417, 1423 (9th Cir.1990). And Batson should not be extended to challenges of gender-based discrimination. United States v. Broussard, 987 F.2d 215 (5th Cir.1993).
Simon cites United States v. DeGross and Powers v. Ohio to support his claim on this point. However, in DeGross the court of appeals forbade the peremptory challenge of an Hispanic woman because of her race  not her gender. DeGross, 913 F.2d 1417 at 1425. And the United States Supreme Court in Powers v. Ohio only forbade unfettered peremptory challenges as to race; gender was neither raised nor discussed. Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Simon's reliance upon DeGross and Powers is misplaced.

III. IMPROPER CHANGE OF VENUE?
This Court stated, in Johnson v. State, "[t]he accused has a right to a change of venue when it is doubtful that an impartial jury can be obtained; such doubt is implicit when there is present strong public sentiment against the defendant... ." Johnson v. State, 476 So.2d 1195, 1210-11 (Miss. 1985).
Simon made an appropriate motion to the Circuit Court of Quitman County for a change of venue from that county because of the widespread publicity which attended this case. The motion was granted, and the trial was moved to Jones County.
In his appellate brief, Simon alleged "[a] number of members of the venire stated during voir dire that they had heard about the case, suggesting that a [second] change of venue was required." The record shows, of 257 members of the special venire in Jones County, sixteen (16) had, indeed, read, seen, or heard something about Simon. However, fourteen (14) of those sixteen (16) also said, when specifically questioned by the trial judge, they had no preconceived ideas about the case or the guilt or innocence of Simon. They also said they could consider only such evidence as was presented to them at trial.
The record does not support Simon's contention that another change of venue was warranted on the basis of pre-trial publicity. Only two potential jurors out of a group of 257 persons stated they could not be impartial, and Jones County presented a venue wherein Simon could receive a fair trial. The two jurors who did have preconceived notions about the trial were dismissed for cause.
Also, at trial and in his brief on appeal, Simon objected to the specific venue of Jones County, because the racial makeup of *412 Jones County did not match that of Quitman County.
Simon contended only twenty-one percent (21%) of the registered voters in Jones County were African-American and about fifty-four percent (54%) of the registered voters in Quitman County were African-American. On that basis, Simon requested a second change of venue to a county with a racial population like that of Quitman County.
The Sixth Amendment to the Constitution of the United States provides for a trial by an impartial jury. However, as we noted in Britt v. State,
Although the defendant does have a right to be tried by a jury whose members were selected pursuant to a nondiscriminatory criteria, the Batson Court noted that the Sixth Amendment to the Constitution of the United States has never been held to require that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the populations.
Britt v. State, 520 So.2d 1377, 1379 (Miss. 1988).
In Lanier v. State, we outlined the elements that must be shown for a prima facie violation of the fair cross-section requirement for an impartial jury:
1. the group alleged to be excluded is a "distinctive" group in the community;
2. the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
3. this under representation is due to systematic exclusion of the group in the jury-selection process. (Emphasis added.)
Lanier v. State, 533 So.2d 473, 477 (Miss. 1988) (quoting from Duren v. Missouri, 439 U.S. 357 at 364, 99 S.Ct. 664 at 668, 58 L.Ed.2d 579 at 587 (1979)).
Simon did not present any evidence which would make a prima facie case that he was denied a trial by an impartial jury representing a fair cross-section of the community. Indeed, no evidence was offered to show the venire did not reflect a fair cross-section of the population of Jones County. Simon's entire argument centered on the difference between the populations of Quitman County and Jones County.
Simon cites no cases that support his contention he was entitled to a second change of venue to a county with a population similar to Quitman County. Indeed, the United States Supreme Court declined to make such a requirement encumbent upon the states in the case of Mallett v. Missouri, 769 S.W.2d 77 (Mo. 1989), cert. denied 494 U.S. 1009, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990).
Mallett, an African-American, was arrested for the murder of a white police officer in Perry County, Missouri, where 1980 census figures showed over 1,100 African-Americans lived. Because of prejudicial pre-trial publicity, Mallett requested a change of venue. Both the State and Mallett offered suggestions for trial, with Mallett specifically expressing the concern that some members of his race reside in whatever county the court chose.
The trial judge moved the trial to Schuyler County  a location suggested by neither the State nor Mallett. According to the 1980 census, of a total of 4,967 persons, three were African-Americans; however, by the time of Mallett's trial, there were no African-Americans living in Schuyler County. Mallett was convicted and sentenced to death by an all-white jury. Mallett appealed, alleging the move to a county with no members of his race violated his constitutional right to a fair trial. The United States Supreme Court declined to accept Mallett's argument and denied certiorari. Mallett, supra.
Simon's motion for a change of venue because of the widespread publicity generated by this case was granted. Nothing in our constitutions, statutes, or case law gives a criminal defendant the right to obtain a venue of his choosing by making repeated motions for a change of venue. The trial judge did not err in overruling Simon's motion for a second change of venue.

CONCLUSION
None of the other assignments of error Simon has proposed warrants discussion by *413 this Court. We find no merit to any of Simon's arguments and hold his convictions for the capital murder, sexual battery and kidnapping of Charlotte Parker should be affirmed.
CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT AFFIRMED; CONVICTION OF SEXUAL BATTERY AND SENTENCE OF THIRTY (30) YEARS AFFIRMED; CONVICTION OF KIDNAPPING AND SENTENCE OF THIRTY (30) YEARS AFFIRMED.
DAN M. LEE and PRATHER, P.JJ., and PITTMAN, McRAE, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
BANKS, J., dissents with separate written opinion joined by SULLIVAN, J.
BANKS, Justice, dissenting:
I am compelled to dissent because of what appear to me to be clear transgressions of the constitution of the United States with regard to the use of race and gender based peremptory challenges in jury selection process. I also take exception to the treatment of the important question of whether choice of venue had an unconstitutionally negative impact upon the defendant's right to a jury venire comprising a fair cross-section of the community.

I.
"Exclusion of black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure." Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In today's opinion, the majority holds that the peremptory challenge of a black venireman for the stated reason of offsetting defense strikes of whites complies with the constitutional mandate that such strikes be for racially neutral reasons. Id. This startling result is reached based solely on the fact that the prosecutor off-handedly mentioned that the accepted juror was also "older." (Majority opinion, ante at pp. 410-411). Simon's contention that venireman Prince was struck in violation of Batson has merit.
The State simply did not utter a race-neutral reason for eliminating Prince from the panel. On the contrary, the State attempted to rebut Simon's prima facie showing of discrimination by claiming the strike of Prince was an appropriate response to what the State assumed was a strategy on the part of Simon to eliminate whites from the jury. In other words, the prosecutor admitted that his strike was based on race. When asked again by the trial court for its reason for striking Prince, the State twice repeated that Prince was struck to combat Simon's strategy to eliminate whites. The third time, the State repeated its rationale, however, the prosecutor added that the white juror who was seated in place of Prince was "older." The trial court, in its summary finding that reasons given for striking Prince were race neutral, made no mention of the State's "age" reason. Moreover, no voir dire was had regarding age-based issues.
The remedy available to the prosecutor, who perceives a racial animus in defense strikes, is to object to such strikes. Georgia v. McCollum, ___ U.S. ___, ___, 112 S.Ct. 2348, 2352-53, 120 L.Ed.2d 33, 43-44 (1992). Such an objection proved successful in this very judicial district and before this very judge as long ago as 1986. Griffin v. State, 610 So.2d 354, 356 (Miss. 1992). There is simply no warrant for a prosecutor exercising strikes based on race because he believes that the defendant is doing so. See U.S. v. DeGross, 960 F.2d 1433, 1443 n. 14 (9th Cir.1992) (court sympathized with prosecutor counteracting defense gender-based challenges but concluded, nevertheless, that a gender-based explanation was not neutral so as to pass constitutional scrutiny.)
Assuming arguendo that the prosecutor actually offered age as his primary reason for striking Prince, the black venireman, and preferring Atwood, the white venireman, which he did not, and, assuming arguendo that the trial court found that age, in this instance, was a race-neutral, non-pretextual reason, which it did not, the majority's determination to affirm based on this record would still remain erroneous. Given the fact that the prosecutor stated repeatedly and in no *414 uncertain terms that his objective was to seat a white juror, no rational fact finder could find that the assertion of the juror's age as a race-neutral reason was not pretextual.
Moreover, "the age rationale is highly suspect because of its inherent susceptibility to abuse." Ex Parte Bird, 594 So.2d 676, 683 (Ala. 1991). "A mere summary determination that age was a factor in the decision to strike is, therefore, constitutionally deficient and warrants reversal." Id.; See also, Chivers v. State, 796 S.W.2d 539, 543 (Tex. Ct. App. 1990) (strike based on age where no explanation given as to why the venireman was "too young" held pretextual); State v. Butler, 731 S.W.2d 265, 271 (Mo. App. 1987) (strike of elderly individual where prosecutor stated into the record that elderly jurors are more subject to intimidation, but where no voir dire was conducted along this line, held pretextual under Batson). See also Colbert v. State, 304 Ark. 250, 801 S.W.2d 643, 646 (1991) (striking racially cognizable veniremen without even propounding a question to them raises an inference of bias under Batson).
There is nothing in this record which supports a finding that the peremptory strike of juror Prince passes constitutional muster. It is, therefore, our duty to reverse. Conerly v. State, 544 So.2d 1370, 1372 (Miss. 1989) (holding that a single unlawful strike compels reversal).

II.
Six of the State's nine peremptory challenges were used to eliminate white women from the jury and a seventh was used against a black woman. Simon, a black male, invokes the holding in Powers v. Ohio, 499 U.S. 400, 409-417, 111 S.Ct. 1364, 1370-74, 113 L.Ed.2d 411, 425-29 (1991), that white defendants have standing to object to the exclusion of black jurors, in support of his challenge to gender based strikes under the reasoning of Batson. The trial court ruled (1) Batson does not apply to women and (2) even if it did, Simon could not bring a Batson challenge as he is not the same gender as women. The second ruling is, of course, erroneous under the reasoning of Powers. The question to be determined is whether Batson applies to gender. Simon seeks remand from this Court for a hearing wherein the prosecution would have an opportunity to rebut the prima facie showing of discrimination. I would grant the remedy Simon seeks.
The majority claims United States v. DeGross, 913 F.2d 1417 (9th Cir.1990), upon which Simon relies, held a peremptory challenge of a Hispanic women was impermissible on the basis of her race and not on the basis of her gender. This is not a correct statement.[1] In addition, the opinion cited by the majority was supplanted by the Ninth Circuit's en banc rehearing of the case. United States v. DeGross, 960 F.2d 1433, 1437-38 (9th Cir.1992) (en banc). The en banc opinion in fact affirmed the panel holding that the peremptory challenge of a venire member on the basis of gender violates equal protection principles. Id. The Ninth Circuit determined the venire member's equal protection right under the Fourteenth Amendment is violated where the venire member is removed from the panel exclusively because of gender, and the criminal defendant's equal protection guarantee under the Fourteenth Amendment as found in Batson is violated when venire member are struck on the basis of gender. Id.
It is true, as the majority notes, that United States v. Broussard, 987 F.2d 215, 217-20 (5th Cir.1993), and United States v. Hamilton, 850 F.2d 1038, 1042 (4th Cir.1988), rejected application of Batson to gender-based, peremptory challenges. Hamilton was decided before the Batson holding was expanded by the Supreme Court in Powers (allowing white defendants to protest removal of persons of another race), Georgia v. McCollum, *415 ___ U.S. ___, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (allowing prosecutors to object to the use of defense challenges) and Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (applying Batson to civil cases). This fact, in my view, lessens the persuasive value of Hamilton. Broussard, on the other hand, is of recent vintage and explicitly rejects the also recently expressed view of the Ninth Circuit in DeGross. Broussard, 987 F.2d at 219-20. The federal circuits are, therefore, split on the issue of gender-based discrimination. See, Dave Herbeck, Eliminating Unconstitutional Juries: Applying United States v. DeGross to All Heightened Scrutiny Equal Protection Groups in the Exercise of Peremptory Challenges, 77 Minn.L.Rev. 689, 706 (1993). The United States Supreme Court has granted certiorari on this issue for the October 1993 term of that court. J.E.B. v. T.B., 606 So.2d 156 (Ala.Ct.Civ.App. 1992) cert. granted ___ U.S. ___, 113 S.Ct. 2330, 124 L.Ed.2d 242 (1993).
DeGross accepts the facts that gender and race are similar immutable characteristics and that women have also been subjected to discrimination and, particularly, exclusion from jury service. The court reached the logical conclusion that gender-based discrimination in this area is just as offensive to the constitution as is race-based discrimination, or, at least, sufficiently offensive to apply the Batson prophylactic. DeGross, 960 F.2d at 1438-1439. The Ninth Circuit stated the proposition well:
A prosecutor's sexually discriminatory peremptory strike also violates the defendant's right to equal protection of the laws because the defendant is entitled to be tried by a jury chosen pursuant to nondiscriminatory criteria. Batson, 476 U.S. at 86-87, 106 S.Ct. at 1717-18. (footnote deleted).
First, just as racial discrimination in the judicial system is a stimulant to community prejudice which impedes equal justice for racial minorities, Id. at 87-88, 106 S.Ct. at 1718, so too is gender discrimination in the judicial system a stimulant to community prejudice which impedes equal justice for women. See Personnel Administrator v. Feeney, 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979) (like classifications based on race, gender classifications traditionally have been the touchstone for pervasive and often subtle gender discrimination).
The history of juries in the United States in one of pervasive, government sanctioned exclusion of women. At common law, women were excluded from juries based on the doctrine of propter defectum sexus, literally, the "defect of sex." 2 William Blackstone, Commentaries 362. In 1880, the Supreme Court declared the exclusion of blacks from jury service to be unconstitutional, but noted that such service might be limited to men. Strauder v. West Virginia, 100 U.S. 303, 310, 25 L.Ed. 664 (1880). In Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961), the Supreme Court held that excluding women from jury service was neither a due process nor an equal protection violation because there was a sufficient rational basis for it  that women are "still regarded as the center of home and family life." Id. at 62, 82 S.Ct. at 162. It was not until 1975 that the Supreme Court held that systematically excluding women from juries violates defendants' Sixth Amendment rights. See Taylor, 419 U.S. at 536, 95 S.Ct. at 700. Permitting gender-based peremptory challenges would simply affirm an erroneous and unconstitutional presumption that women are less qualified than men to serve as jurors. DeGross, 960 F.2d at 1438.
The Broussard court responds with two main arguments. First, it argues that extending Batson to gender would result in an explanation of every challenge because every juror is either a man or a woman. The easy answer to that is that every person is of a particular race and, therefore, in theory, every strike is subject to explanation in race neutral terms.[2] Further explication of a *416 strike in gender neutral terms is not much of an added burden.
The Broussard panel also observed that women are not a numerical minority and reasoned that they are, therefore, in less need of Batson type protection. The argument is that there is little incentive for systematic gender-based strikes because rarely can one eliminate all of one gender from a given jury.
Of course, the litigant is only concerned about one jury. Even if the second objective of Batson, protecting the prospective juror from exclusion from service based on race, may not require as much in the context of gender, the first objective, the right of the litigant to a jury not arrived at by impermissible means is protected only by a Batson type procedure. Moreover, this and other courts have recognized the mere fact that it is impossible to eliminate every member of a race from the final jury through the use of peremptory challenges, or that some members of a race were ultimately seated on the jury, does not allow the offensive practices to escape review. Conerly v. State, 544 So.2d at 372; United States v. Joe, 928 F.2d 99, 102-03 (4th Cir.1991) (as racial composition of jury is not, in itself, dispositive of Batson discrimination, fact that five black veniremen were ultimately seated does not preclude finding that defendant established a Batson violation if defendant can show peremptory strikes of black veniremen were pretextual); United States v. Lane, 866 F.2d 103, 105 (4th Cir.1989) ("striking only one black prospective juror for a discriminatory reason violates a black defendant's equal protection rights, even when other black jurors are seated and even when valid reasons are articulated for challenges to other black, prospective jurors"); United States v. Clemons, 843 F.2d 741, 748 (3rd Cir.1988) ("Although it may be easier to establish a prima facie case when all blacks are excluded from a jury, or when one or two blacks are excluded from a panel in a district with a relatively low population, we cannot say the conclusion is automatic ... .. Nor can we conclude that inclusion of blacks on a jury bars a prima facie case, especially where other facts and circumstances may constitute an inference of prosecutorial discrimination in the selection process."); United States v. Battle, 836 F.2d 1084, 1086 (8th Cir.1987) ("the striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors"); Fleming v. Kemp, 794 F.2d 1478, 1483 (11th Cir.1986) (fact that not all black veniremen were excluded from jury does not render Batson inapplicable). The reasoning of these cases involving race applies equally to gender based strikes.
It is my view that the Ninth Circuit's analysis of Batson as it applies to gender is the constitutionally sound path for this Court to follow. See also Ex Parte Dysart, 581 So.2d 545 (Ala. 1991) (Maddox, J., dissenting from denial of certiorari and expressing a similar view.)
III.
Just as state prosecutors may not use peremptory challenges to exclude members of the defendant's race from the jury, Batson v. Kentucky, 476 U.S. 79, 90 L.Ed.2d 69, 106 S.Ct. 1712 (1986), state trial courts may not transfer venue of the trial to accomplish the same result by another means.
Mallett v. Missouri, 494 U.S. 1009, 1009, 110 S.Ct. 1308, 1308-1309, 108 L.Ed.2d 484, 484 (1990) (Justice Marshall, with whom Justice Brennan joined, dissenting).
This case also presents an issue of national currency that promises to remain near the forefront of those begging definitive resolution. Gilbert, An Ounce of Prevention: A Constitutional Prescription for Choice of Venue in Racially Sensitive Criminal Cases 67 Tulane L.Rev. 1855, 1931-35 (1993); Note, Out of the Frying Pan or Into the Fire? Race and Choice of Venue After Rodney King, 106 Harv.L.Rev. 705 (1993); Outram, Change of Venue  A Constitutional Analysis, Nat'l Bar Assoc. Magazine 26 (April-June *417 1993); Riley, King Trial Fuels Bill on Fair Jury Selection, Newsday, June 3, 1992, at 25; Lozano v. State, 584 So.2d 19 (Fla. Dist. Ct. App. 1991) review denied 595 So.2d 558 (Fla. 1992). There have been legislative attempts to address the issue in several states.[3] That question is: To what extent should our courts consider the relative demographics, especially the racial demographics, of the original venue and the venue to which a criminal matter is transferred? It is a question of grave importance to both the prosecuting sovereign and the defendant, especially in high profile cases.[4]
The right to trial by jury is perhaps the most valued attribute of our judicial system. Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). It embodies our commitment to democracy and to individual rights. Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). The jury is intended to insure the participation of the governed and the protection of the individual from the state. Mississippi Publishers Corp. v. Coleman, 515 So.2d 1163, 1165 (Miss. 1987). In order to perform these functions as intended it is essential that juries reflect the governed. Powers v. Ohio, 499 U.S. 400, 402, 111 S.Ct. 1364, 1366, 113 L.Ed.2d 411, 419 (1991) ("Jury service is an exercise of responsible citizenship by all members of the community, including those who otherwise might not have the opportunity to contribute to our civic life."). While we recognize that it is not practical, or even possible, to assure that each jury precisely reflect the physical, emotional, cultural and intellectual characteristics of the community as a whole, we have historically aspired to eliminate impediments to such a result. Cf. Hernandez v. New York, 500 U.S. 352, 369-71, 111 S.Ct. 1859, 1872, 114 L.Ed.2d 395, 413 (1991); Batson, 476 U.S. at 86-88, 106 S.Ct. at 1717, 1718.
In former times, geographic insularity played an important, perhaps dominant, role in shaping the culture and mores of particular communities. A defendant's right to be tried in the geographic area where the crime was committed is based in part on a right to be tried by people with the characteristics of those in the community where the action took place. U.S. v. Johnson, 323 U.S. 273, 276, 65 S.Ct. 249, 251, 89 L.Ed. 236 (1944). In modern society, with instant world-wide communications and pervasive electronic media, the diversity of community characteristics is marked by factors of race, ethnicity, religion, gender and national origin to a much greater extent than by geography.[5]
The concern for maintaining a jury of similar characteristics to the one which could be drawn in the area where the crime was committed is manifested in state statutes and practices requiring that venue, in the event of change, be assigned to an adjoining county (Ky. Rev. Stat. Ann. § 452.210 (Supp. 1993); Ariz. Rev. Stat. Ann. § 12-407 (Supp. 1992); Mo. Rev. Stat.Ann. § 452.210) or to a "nearby" county. Ala. Code § 15-2-24 (Supp. 1992); N.C. Gen. Stat. § 15A-957 (Supp. 1992) (venue must be moved to either the "nearest" county or another county in that prosecutorial district). We must take cognizance of the reality of modern society and give it effect if we are to preserve the traditional objectives and values of trial by jury. It is a task which requires that defendants not be tried by juries selected from venires drawn from sources which drastically diminish the prospect of a jury that reflects the demographic *418 characteristics of community where the crime was committed.
Perhaps the demographic characteristic of the most concern is that of race. In the words of Justice Sandra Day O'Connor, "[i]t is by now clear that conscious and unconscious racism can affect the way white jurors perceive minority defendants and the facts presented at their trials, perhaps determining the verdict of guilt or innocence. See Developments in the Law  Race and the Criminal Process, 101 Harv.L.Rev. 1472, 1559-1560 (1988); Colbert, Challenging the Challenge: Thirteenth Amendment as a Prohibition Against the Racial Use of Peremptory Challenges, 76 Cornell L.Rev. 1, 110-112 (1990)". Georgia v. McCollum, 505 U.S. ___, ___, 112 S.Ct. 2348, 2363-64, 120 L.Ed.2d 33, 57-58 (O'Connor, J., dissenting) (1992). The articles cited relate studies which demonstrated the correlation between single race and multi-race juries and outcome. Id. Without belaboring the point, it should be obvious to all that a drastic change in the racial make-up of a jury may affect outcome, and certainly affects the perception and acceptance of outcome, in high profile cases. For, "to perform its high function in the best way, `justice must satisfy the appearance of justice.'" In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (quoting Offutt v. U.S., 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954)).
Here, venue was changed from Quitman County to Jones County because pervasive pretrial publicity in Quitman County promised to prejudice Simon's chances for a fair trial there. In his written motion for change of venue, and during the oral argument on the motion, Simon requested that the transfer county have, at minimum, an analogous racial composition with Quitman County. Following an order changing venue to Jones County, Simon, relying on 1980 Census data, implored the court to reconsider the selection of Jones County on the basis that Jones County does not share a similar racial composition with Quitman County. The court denied the motion to reconsider and articulated the following rationale:
The Court, of course, changed venue and the Court entered that Order and took this case to an area that it felt like would be far away and as unattached to anything that would have to do with what was happening in this area as we could find. I was aware of the Court facilities in Jones County and the Court knows of no real requirement that it looks at the racial considerations at all when it makes a change of venue or when we try a case here. The Court knows of no legal requirement that  the Court considered as much as it could in entering the Order seeing that the jury was called from the county at large of Jones County, and I know of no reason to believe that the jurors of Jones County would have any reason to be biased or prejudiced for or against either side of this case because of their  the remoteness of them from this area. And I don't believe the persons in that area would have any preconceived notions as to guilt or innocence of this Defendant of any sort unless they say so, and we'll certainly voir dire them diligently to be sure that they respond not on account of race or any other reason that I am aware, so the Court will reject any attempt to move the venue of the case to any other venue than the First Judicial District of Jones County. (emphasis added)
According to the 1980 Census, 55.98 percent of the Quitman County population was composed of black residents (7,074 out of 12,636 total citizens) while blacks comprised 23.13 percent of the Jones County population (14,318 out of 61,912 total citizens).[6] Put another way, for every Jones County black, there were 2.42 blacks in Quitman County, by percentage. The percentage figures for the 1990 Census, which we may judicially note, lessened the gap by a fraction: for every Jones County black there are 2.36 blacks in Quitman County.[7] More significantly, *419 the voting or jury aged populations of Quitman and Jones counties as reflected by the 1990 census data are 53.24 percent and 21.54 percent respectively.[8] The black voting age population of the state as a whole is 31.63%. There are 58 of the total 82 counties which have voting age populations greater than that of Jones County. The median black voting age population by county is approximately 32.54 percent.[9]
Simon asserts that the change of venue offended the United States Constitution in several respects. "Although a defendant has no right to a jury of any particular racial composition, we have long held that the State cannot act so as to deprive a defendant of his right to a venire that is `truly representative of the community.' Smith v. Texas, 311 U.S. 128, [130], 61 S.Ct. 164, [165] 85 L.Ed. 84 (1940)." Mallett v. Missouri, 494 U.S. 1009, 1011, 110 S.Ct. 1308, 1310, 108 L.Ed.2d 484, 486 (Marshall, J., dissenting) (1990).[10] One has a right to be free of procedures that operate to systematically exclude members of one's race from the venire and, ultimately, the jury. Batson v. Kentucky, 476 U.S. at 86, 106 S.Ct. at 1717, 90 L.Ed.2d at 80-81; Alexander v. Louisiana, 405 U.S. 625, 628-29, 92 S.Ct. 1221, 1224, 31 L.Ed.2d 536, 540-41 (1972); Chinn v. State, 248 So.2d 801, 801-02 (Miss. 1971). Moreover, a defendant has a right guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States to a jury drawn from a fair cross section of the community Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Further,
[s]ince the Fourteenth Amendment protects an accused throughout the proceedings bringing him to justice, Hill v. Texas, 316 U.S. 400, 406, 62 S.Ct. 1159, 1162, 86 L.Ed. 1559 (1942), the State may not draw up its jury lists pursuant to neutral procedures but then resort to discrimination at "other stages of the selection process," Avery v. Georgia, 345 U.S. 559, 562, 73 S.Ct. 891, 893, 97 L.Ed. 1244 (1953); see McCray v. New York, supra, 461 U.S. [961] at 965, 968, 103 Ct. [2438] at 2440, 2443[, 77 L.Ed.2d 1322] (Marshall, J., dissenting from denial of certiorari); see also Alexander v. Louisiana, 405 U.S. 625, 632, 92 S.Ct. 1221, 1224, 31 L.Ed.2d 536 (1972). Batson v. Kentucky, 476 U.S. at 90, 106 S.Ct. at 1719, 90 L.Ed.2d at 83.
Although the court referred to peremptory challenges in Batson, surely change of venue is a part of the process to which the Fourteenth Amendment applies.
As far as the writer can determine, the United States Supreme Court declined review in its only opportunity to address this question. Mallett, supra. There, Justice Marshall, dissenting from the Court's refusal to grant certiorari, wrote that the change of venue from the forum county (6.55 percent black) to the transferee county (0.06 percent black) gave rise to a prima facie case of purposeful discrimination.[11]Mallett, 494 *420 U.S. 1009-10, 110 S.Ct. 1308-1309, 108 L.Ed.2d 484, 485 (1990). According to Justice Marshall:
The court's transfer decision reduced the number of Afro-Americans on Mallett's venire; the virtually unrestricted discretion of the trial judge to make the venue determination presented an opportunity to discriminate; and the judge transferred the case to a county with no members of Mallett's race. The trial judge failed to offer a `specific or compelling' neutral explanation for the transfer. Mallett, 494 U.S. at 1009-10, 110 S.Ct. at 1309, 108 L.Ed.2d at 486. (Marshall, J., dissenting).
Generally, discriminatory purpose violative of the Fourteenth Amendment's equal protection guarantee requires more than just a showing of unfavorable, racial impact. Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 2048-49, 48 L.Ed.2d 597, 608-09 (1976). The petitioner must demonstrate, above unfavorable impact, circumstantial evidence to prove discriminatory intent. Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450, 465-66 (1977) (historical background, specific sequence of events, departures from normal procedures, etc.).
Such is not the case in actions seeking to demonstrate racially biased selection procedures for juries. Alexander v. Louisiana, 405 U.S. 625, 631-32, 92 S.Ct. 1221, 1225-26, 31 L.Ed.2d 536, 542-43 (1972) citing Whitus v. Georgia, 385 U.S. 545, 552, 87 S.Ct. 643, 647-48, 17 L.Ed.2d 599, 605 (1967) (after prima facie case made of invidious, race-based discrimination, where State fails to show that jury commissioners selected white grand jurors for race-neutral reasons, "`the opportunity for discrimination was present and [it cannot be said] on this record that it was not resorted to by the commissioners'"); Hill v. Texas, 316 U.S. 400, 404, 62 S.Ct. 1159, 1161, 86 L.Ed. 1559, 1562, (1942) (it is well established that jury commissioners may not "pursue a course of conduct in the administration of their office which would operate to discriminate in the selection of jurors on racial grounds"). In particular, in Norris v. Alabama, 294 U.S. 587, 591-92, 55 S.Ct. 579, 581, 79 L.Ed. 1074, 1077 (1935), the Court determined the fact that blacks constituted a substantial segment of the population of a given county, but that none of the blacks were called to jury duty established a prima facie case, in and of itself, of systematic exclusion of blacks from the jury system.
The majority intimates that Simon waived his rights regarding the demographics of venue when he sought a change. An answer to that contention may be found in Brooks v. Tennessee, 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972), where the court made it clear that one should not unnecessarily be compelled to waive one constitutional right in order to exercise another. The trial court in refusing to consider the demographics of the transferee county, violated, in my view, Simon's rights under Art. 3, § 26 of the constitution of the state of Mississippi and the Sixth and Fourteenth Amendments to the Constitution of the United States.
While Jones County may ultimately have been the best choice of venue for the trial of this case, that is a determination to be made only after careful consideration of all factors which impact upon the prospect of a trial by a fair and impartial jury. Relative freedom from prejudicial pre-trial publicity is one factor. Distance and the capability of the prospective locale to accommodate the proceedings contemplated are others. The degree of change in the racial composition of the community from which the venire is to be selected is another factor which should be considered, at least in cases where the victim and defendant are of opposite races or race is otherwise a potential issue. No person should be tried unless the record reflects that this latter factor is carefully considered, and that there is a specific, compelling, race-neutral reason given for the preference of the transferee county over other sites would be more demographically analogous.

IV.
Simon is entitled to a new trial based on the Batson violation as set forth in Section I *421 of this opinion. I would also hold that Simon is entitled to a remand so that the record could be amplified with respect to the issues discussed in Sections II and III.
SULLIVAN, J., joins this dissent.
NOTES
[1] At the time of his arrest, Simon was wearing a pair of boots that were later identified by Scott Parker, another grown son of Carl's. The boots belonged to Scott, who had left them at home when he reported for naval duty in the Pacific.
[1] The Ninth Circuit panel wrote:

"After DeGross established a prima facie case of discrimination, the district court properly required the prosecutor to justify his challenge of Tellez on nondiscriminatory grounds. The prosecutor stated that he sought to exclude Tellez primarily because she is a woman and he desired more men on the jury. That statement constituted an admission of purposeful gender discrimination which, under our holding in Section I, violated Tellez's equal protection rights, and also violated DeGross' equal protection rights. See Batson, 476 U.S. at 86-87, 106 S.Ct. at 17-18. (parenthetical deleted)" United States v. DeGross, 913 F.2d 1417, 1426 (9th Cir.1990).
[2] While it is true that the question of whether minority defendants striking members of the majority racial group violates Batson is one yet to be explicitly decided by the United States Supreme Court, this Court has decided that issue in the affirmative. Griffin v. State, 610 So.2d 354, 356 (Miss. 1992). Furthermore, despite the fact that there are cogent arguments to the contrary, in the words of Justice Thomas: "it is difficult to see how the result would be different" than that which obtains when the opposite is true when the United States Supreme Court reaches that issue. Georgia v. McCollum, 505 U.S. at ___, 112 S.Ct. at 2360 n. 2 (Thomas, J., concurring).
[3] At the time of this writing, the California Legislature is considering S.B. 159. This bill amends the California change of venue provisions for criminal cases such that the court of original venue may consider "demographic characteristics," such as race and gender composition of the county of original venue versus the proposed transferee counties, in making the decisions of whether and where to change venue.
[4] We are aware of a similar situation in at least one other case before this Court: Anthony Carr v. State of Mississippi, 90-DP-1106. This case involves Simon's co-defendant, Anthony Carr, whose trial was transferred to Alcorn County which has a black jury aged population of 9.80 percent according to 1990 Census data. This Court has yet to render a disposition in Carr v. State. The case was argued before this Court on June 15, 1993.
[5] Indeed, geographic proximity has never obliterated the cultural differences between those of African and those of European descent in the south or in our nation at large. This may be attributed in large measure to racism and its manifestations in rigid segregation laws and the like.
[6] U.S. Department of Commerce, General Population Characteristics, 1980 Census: Mississippi. SuDoc PC80-1-B26, 1982.
[7] The 1990 figures for Quitman County indicate 6,193 of the total population of 10,490 is black (or, 59.04 percent). In Jones County, of the total population of 62,031 residents, 15,489 are black (or, 24.96 percent). U.S. Department of Commerce, Summary Population and Housing Characteristics. SuDoc CPH 1-26, 1991.
[8] These figures actually reflect voting age populations which vary slightly from jury age population because although 18 year old persons may vote, they may not serve on a jury until they reach the age of 21.
[9] Lowndes County has the 41st highest black percentage: 32.87. Franklin County is 42nd at 32.21. The median figure is derived by finding the middle point between these figures. That figure is 32.54 percent.
[10] The majority relies on this case for the proposition that the U.S. Supreme Court has "declined to accept" a vicinage argument which parallels that made by Simon. (Majority opinion at 412-413). The majority thus implicitly contends the denial of a writ of certiorari in Mallett equates to an affirmative adverse disposition of Simon's argument. It is, however, well-settled that denials of certiorari are void of precedential value. United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361, 364 (1923); see Agoston v. Pennsylvania, 340 U.S. 844, 844-45, 71 S.Ct. 9, 9, 95 L.Ed. 619, 619 (1950) (Frankfurter, J., memorandum statement); see also United States v. Kras, 409 U.S. 434, 443, 93 S.Ct. 631, 637, 34 L.Ed.2d 626, 634-35 (1973); United States v. Shubert, 348 U.S. 222, 228 n. 10, 75 S.Ct. 277, 281 n. 10, 99 L.Ed. 279, 286 n. 10 (1955).
[11] The Missouri trial court in post-conviction proceedings had found a constitutional violation. That court found the following facts: (1) the case involves a cross-racial murder of a state trooper; (2) the decision of the [Perry County judge] was made without giving counsel an opportunity to object; (3) counties which were of equal convenience to witnesses; equally free of pre-trial publicity; of equal, greater or less distance; and included blacks were tendered by the defense and prosecution; (5) there were no blacks living in Schuyler County at the time of trial; (6) movant was a black man; (7) the defense expressed concern that the county chosen include blacks. Mallett v. Missouri, 769 S.W.2d 77.