# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-DP-01312-SCT

*KRISTI LEIGH FULGHAM*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/09/2006 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF CAPITAL DEFENSE COUNSEL BY: JAMES LAPPAN |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JASON L. DAVIS MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY |
| DISPOSITION: | CONVICTION OF CAPITAL MURDER, AFFIRMED. SENTENCE OF DEATH, REVERSED AND REMANDED - 10/28/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     Kristi Fulgham was convicted of capital murder[1] and sentenced to death for killing her husband, Joey Fulgham.[2]  Fulgham claims numerous errors at the guilt and sentencing

---

[1]Miss. Code Ann. § 97-3-19(e) (Rev. 2006).

[2]Fulgham's brother, Tyler Edmonds, was indicted separately for the capital murder of Joey Fulgham. *See Edmonds v. State*, 955 So. 2d 787 (Miss. 2007).

phases of her trial. We find merit in one assignment of error: The trial court committed reversible error by limiting mitigation evidence. Specifically, the court erred by refusing to allow social worker Adrienne Dorsey-Kidd to testify to her observations as mitigating evidence at the sentencing phase. So we affirm Fulgham's conviction of capital murder and reverse her sentence of death and remand for a new sentencing hearing.

**FACTS**

¶2.    Kristi and Joey Fulgham married in 1991 and lived in the Starkville area. They had two children, Tyler and Darian Fulgham. Both children lived with them, along with Hayley, Fulgham's daughter by another man.

¶3.    Approximately a year and a half prior to Joey's death, Fulgham and her children moved out of the marital home and began living with Fulgham's boyfriend, Kyle Harvey. However, by May 2003, Fulgham had moved back in with Joey, and the two were working on their marriage.[3] On Sunday, May 11, 2003, Joey's body was discovered with a fatal gunshot wound to the head. Under the State's theory, Fulgham killed her husband for insurance proceeds and robbed him of his wallet (and its contents) and a computer's central processing unit (CPU).

¶4.    Shannon Fulgham, Joey's brother, testified that he had worked with Joey at a car dealership, and they were paid every Friday around lunch time. Shannon stated that on May 9, 2003, Joey had cashed his paycheck for approximately $1,020 and had placed the money

---

[3]Fulgham moved back into the marital home about six months prior to Joey Fulgham's death.

2

in his wallet. He further testified that he and Joey had planned to attend an air show on Saturday, May 10, 2003, but that Joey did not answer Shannon's phone calls when he called around 11:00 a.m. or 11:30 a.m. Shannon also testified that he had stopped by Joey and Kristi Fulgham's home around 12:00 p.m. or 12:30 p.m. and that Joey had not answered the door. When Shannon did not hear from his brother by Sunday afternoon, he cut the screen on Joey's living room window and entered the home at approximately 5:30 p.m. He found Joey lying face down in bed and called 911.

¶5. Kyle Harvey met Kristi Fulgham in 2002, and she and her three children began living with him in Jackson in March 2002. Kyle testified that Fulgham later moved back into her home with Joey. Kyle stated that Fulgham had planned to live with Joey until she found a new home, and that she would come to Jackson to look at homes for sale in the area. Kyle testified that Fulgham had told him that she was going to inherit $300,000 from her grandmother.

¶6. Kyle stated that he and Fulgham had planned a trip to the Mississippi Gulf Coast for Mother's Day weekend, May 9-11, 2003. Fulgham had told Kyle that she would pay for the trip, even though she was unemployed at the time. Kyle stated that Fulgham had picked up her brother, Tyler Edmonds, on Friday night, and she had called Kyle at 6:30 a.m. on Saturday morning (May 10) and informed him that she was on her way to Jackson. Fulgham, her three children, and Tyler Edmonds were waiting at Kyle's apartment when he arrived home from work on Saturday morning at approximately 10:30 or 11:00 a.m. Kyle stated that they had proceeded to the Coast, and that Fulgham had a large amount of cash on her person.

3

Kyle also testified that Fulgham had paid in cash for souvenirs, food, and their hotel room at the Beau Rivage Hotel. They spent Saturday night on the Coast and returned to Jackson at approximately 5 p.m. on Sunday.

¶7.    David Noel, Joey's stepfather, testified that Tyler and Darian Fulgham routinely had spent Friday nights with him. David testified that he had picked up Tyler and Darian between 4 p.m. and 4:30 p.m. on Friday, May 9, 2003. David stated that Fulgham, her three children, and Tyler Edmonds were home at the time. Fulgham informed him that she would pick up Tyler and Darian early the next morning because she was taking the children to the Coast. David testified that Fulgham called him between 4:30 a.m. and 5:00 a.m. Saturday morning and arrived after 5 a.m. to pick up the boys.

¶8.    Robert Elmore, chief investigator for the Oktibbeha County Sheriff's Department, received a call to process the homicide scene at the Fulgham home. He found Joey lying face down with a gunshot wound to the head. Robert searched the home for evidence but did not find any shell casings or Joey's wallet. He also stated that the carpet in the living room was faintly outlined in the shape of a CPU.

¶9.    Robert testified that the house had security lights around the perimeter but that four light bulbs had been unscrewed, which prevented them from automatically turning on. Jason Pressley, who in 2003 worked for the Mississippi Crime Laboratory, conducted a latent-print examination on the light bulbs and found Kristi Fulgham's print on one of them. Pressley testified that he would not expect to find a well-developed print on a light bulb that had been

4

on for an extended period of time, evidencing that the light bulbs had been recently unscrewed.

¶10.    Dr. Steven Hayne testified that he had performed an autopsy on Joey. He stated that an entrance gunshot wound was located at the back of Joey's head, and that he had extracted a small-caliber lead bullet consistent with a .22 caliber projectile. Dr. Hayne stated that Joey had died from the gunshot wound. He also testified that Joey's death had occurred approximately thirty-six to forty-eight hours prior to discovery of the body.

¶11.    Randy Simpson, Tyler Edmonds's first cousin, testified that he had gone to Tyler Edmonds's house almost daily. He stated that two .22 caliber weapons had been in Tyler Edmonds's house prior to Joey's death, but that the older .22 was currently missing. Randy testified that the .22 was a single-shot, bolt-action, and that Tyler Edmonds was not strong enough to pull back the firing mechanism.

¶12.    Danny Edmonds, Kristi Fulgham's biological father, testified that she had asked him for a gun about a week or two prior to Joey's death. He stated that Fulgham had told him that she "wanted Joey dead. That he [Joey] was mean to her and her kids." Danny also stated that Fulgham had told him, "I want him dead, and that he has a life insurance policy, and . . . the kids would get $300,000, and I would get $200,000." He testified that Fulgham had offered to buy him a Cadillac if he "would keep his mouth shut."

¶13.    Scotty Carrithers testified that he had met Joey in the National Guard and that in 2003, he had handled life-insurance records for the National Guard unit in Ackerman. Scotty stated that Joey had two life insurance policies. The first policy was worth $55,000, and Kristi

Fulgham was the named beneficiary. The second policy was worth $255,000, and Kristi Fulgham was initially the named beneficiary, but Joey had changed the beneficiary from Kristi to his mother. Scotty stated that about a month prior to Joey's death, Fulgham had called him inquiring about the amount of Joey's life insurance. Scotty informed her that Joey had signed a privacy statement and that he could not release that information to her.

¶14. The jury found Fulgham guilty of killing her husband while engaged in the commission of a robbery. At the sentencing phase, the jury found unanimously beyond a reasonable doubt that Kristi Fulgham had intended that the killing of Joey Fulgham take place and had contemplated that lethal force would be employed. The jury further found beyond a reasonable doubt the existence of two aggravators: (1) the capital murder was committed for pecuniary gain; and (2) the capital murder was committed during the commission of a robbery. Lastly, the jury unanimously found that the mitigating evidence did not outweigh the aggravating evidence, and that Fulgham should suffer the penalty of death.

## DISCUSSION

¶15. For ease of discussion, we have reordered the issues raised by Fulgham in her appellate brief. Where two issues are interrelated, we have combined them. And because we reverse for a new sentencing hearing, we decline to address those penalty-phase issues that now are moot on appeal and not likely to reoccur on resentencing.

*Standard of Review*

¶16.    Fulgham's conviction rests upon circumstantial evidence.   In a case based on circumstantial evidence, "[i]t is fundamental that convictions of crime cannot be sustained on proof which amounts to no more than a possibility or even when it amounts to a probability, but it must rise to the height which will exclude every reasonable doubt[.]"[4] Further, this Court applies heightened scrutiny to capital-murder convictions where a sentence of death has been imposed.[5]   We repeatedly have ruled that "'[w]hat may be harmless error in a case with less at stake [may become] reversible error when the penalty is death.'"[6]

*Guilt Phase*

### I.    Whether the trial court erred in refusing Fulgham's unanimity instruction D-48.

¶17.    This Court has ruled that "'[t]he trial court enjoys considerable discretion regarding the form and substance of jury instructions.'"[7]   "'In determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole.   When so read, if the instructions fairly announce the law of the case and create no

---

[4]***Kolberg v. State***, 829 So. 2d 29, 39 (Miss. 2002).

[5]***Bishop v. State***, 812 So. 2d 934, 938 (Miss. 2002) (citations omitted).

[6]***Id.*** (quoting ***Flowers v. State***, 773 So. 2d 309, 317 (Miss. 2000)).

[7]***Chatman v. State***, 761 So. 2d 851, 845 (Miss. 2000) (quoting ***Higgins v. State***, 725 So. 2d 220, 223 (Miss. 1998)).

7

injustice, no reversible error will be found.'"[8] In order to show that the trial court abused its discretion in refusing to grant an instruction, the defendant must show "that his requested instruction was (1) a correct statement of the law, (2) not substantially covered in the jury charges as a whole, and (3) of such importance that the court's failure to instruct the jury on that issue seriously impaired the defendant's ability to present his given defense."[9]

¶18. Instruction D-48 reads:

> For you to find Kristi Fulgham guilty of capital murder, you must also agree, unanimously and beyond a reasonable doubt, that Ms. Fulgham robbed Joey Fulgham of the same item. If all twelve of you do not agree on the same criminal act which supports the State's allegation of robbery, you must find Kristi Fulgham not guilty of capital murder.

¶19. Fulgham argues that the underlying felony of robbery is a specific-intent crime, and that the jury should have been instructed that it must agree unanimously on which item was taken. Fulgham argues that the trial court's failure to grant instruction D-48 violated her state and federal constitutional right to a unanimous verdict, because she claims the State argued that Fulgham took Joey's wallet, the CPU, and the life-insurance proceeds.

¶20. Fulgham also argues that the State created a situation in which certain members of the jury could have found that Fulgham had robbed Joey of his wallet while other jurors could have found that she had taken the CPU. Finally, Fulgham argues that a conviction based on

---

[8]*Edwards v. State*, 737 So. 2d 275, 305 (Miss. 1999) (citing *Coleman v. State*, 697 So. 2d 777, 782 (Miss. 1997), *disagreed with on other grounds by Dilworth v. State*, 909 So. 2d 731 (Miss. 2005)) (quoting *Collins v. State*, 691 So. 2d 918, 922 (Miss. 1997))).

[9]*Chatman*, 761 So. 2d at 845-55 (quoting *U.S. v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998)).

the missing CPU is against the overwhelming weight of the evidence, as there is no evidence that the CPU was present in the house on Friday night or that it was appropriated by criminal means.

¶21.   Contrary to her arguments, a review of the record does not show an argument by the State that Fulgham had robbed Joey of life insurance proceeds.  The State argued that Fulgham had a desire for money and that the life insurance proceeds served as a *motive* for the murder.  But the State did argue that Fulgham had robbed Joey of his wallet (and its contents) and/or the CPU.

¶22.   To obtain a conviction for robbery, the State must prove beyond a reasonable doubt that the defendant: (1) feloniously took (2) *the personal property of another* (3) in his presence or from his person and (4) against his will, (5) by violence to his person or by putting such person in fear of some immediate injury to his person.[10]  At issue is whether the court should have granted a specific unanimity instruction relative to element two (as embodied in D-48), because the State argued alternative theories of what personal property was taken.

¶23.   We begin our analysis of this issue by recognizing that criminal defendants in state courts do not have a federal constitutional right to a unanimous verdict by a twelve-member jury.[11]  But Article 3, Section 31 of the Mississippi Constitution[12] has been interpreted to

---

[10]Miss. Code Ann. § 97-3-73 (Rev. 2006); *see also* **Downs v. State**, 962 So. 2d 1255, 1259 (Miss. 2007) (citing Miss. Code Ann. § 97-3-73) (emphasis added).

[11]*See* **Apodaca v. Oregon**, 406 U.S. 404, 410-12, 92 S. Ct. 1628, 32 L. Ed. 2d 184 (1972); **Johnson v. Louisiana**, 406 U.S. 356, 359-63, 92 S. Ct. 1620, 32 L. Ed. 2d 152

9

provide criminal defendants the right to a unanimous jury verdict of twelve impartial jurors.[13]

Even so, we do not believe that this right was violated under the facts of this case (as will be explained below). Furthermore, we look to the U.S. Supreme Court's precedent in interpreting our state constitution.

¶24. In *Schad v. Arizona*,[14] the defendant appealed his conviction of first-degree murder[15] where the prosecution had argued, and the trial court had instructed on, two theories of liability: premeditated murder and felony murder.[16] On appeal, the Supreme Court framed the issue as "whether it was constitutionally acceptable to permit the jurors to reach one verdict based on any combination of the alternative findings."[17] In its analysis, the Court stated:

---

(1972); *but see* **Burch v. Lousiana**, 441 U.S. 130, 99 S. Ct. 1623, 60 L. Ed. 2d 96 (1979) (requiring unanimity for conviction of a nonpetty offense by a six-person jury).

[12]Miss. Const. art. 3, § 31 (granting right to trial by jury).

[13]**Markham v. State**, 209 Miss. 135, 137, 46 So. 2d 88, 89 (Miss. 1950).

[14]**Schad v. Arizona**, 501 U.S. 624, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991)

[15]The statute at issue defined first degree murder as:
[A]ll murder, which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery, or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder in the second degree. *Id.* (citing 1794 Pa. Laws, ch. 1766, §2).

[16]*Id.* at 629.

[17]*Id.* at 630.

We have never suggested that in returning general verdicts in such cases, the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone. In these cases, as in litigation generally, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict."[18]

The Court held that premeditation and felony murder were alternative *means* of proving first-degree murder, and that such an option "did not fall beyond the constitutional bounds of fundamental fairness and rationality."[19]

¶25. In **Griffin v. United States**,[20] the Court considered whether either its precedent or the Due Process Clause of the Fifth Amendment required that a general guilty verdict on a multiple-object conspiracy be set aside if the evidence was inadequate to support a conviction as to one of the objects.[21] The Court began its analysis with the common-law rule that "a general jury verdict was valid so long as it was legally supportable on one of the submitted grounds – even though it gave no assurance that a valid ground, rather than an invalid one, was actually the basis for the jury's action."[22] The Court concluded that this rule applied to

---

[18]*Id.* at 631-32 (quoting **McKoy v. North Carolina**, 494 U.S. 433, 449, 110 S. Ct. 1227, 1236-37, 108 L. Ed. 2d 369 (1990)).

[19]*Id.* at 645.

[20]*Griffin v. United States*, 502 U.S. 46, 112 S. Ct 466, 116 L. Ed. 2d 371 (1991).

[21]*Id.* at 47.

[22]*Id.* at 49.

11

a "variety of contexts" including "a general jury verdict under a single count charging the commission of an offense by two or more means."[23]

¶26.    The Court did find that reversal was warranted where the jury was presented with alternative legal theories, one of which was legal error, but *not* where the jury was presented with alternative factual theories and one was factually inadequate.[24] The Court explained its holding with the following analysis:

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law – whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence . . . As the Seventh Circuit put it:
>
> > It is one thing to negate a verdict that, while supported by the evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance – remote, it seems to us – that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient.[25]

¶27.    And in *Richardson v. United States*,[26] the defendant appealed his conviction under a federal criminal statute that prohibited a person from "engaging in a continuing criminal

---

[23]*Id.* at 50.

[24]*Id.* at 60.

[25]*Id.* at 59-60 (citations omitted).

[26]*Richardson v. U.S.*, 526 U.S. 813, 119 S. Ct. 1707, 143 L. Ed. 2d 985 (1999).

enterprise."[27]  The statute defined "continuing criminal enterprise" as "part of a continuing series of violations."[28]  On appeal, the Court examined "whether a jury has to agree unanimously about which specific violations make up the 'continuing series of violations.'"[29]  The Court held that a jury must agree unanimously about the specific violations, since the phrase "series of violations" constituted several *elements*.[30]  In reaching its holding, the Court distinguished the case before it from a juror disagreement over the *means*:

> The question before us arises because a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime . . . . Where, for example, an element of robbery is force or the threat of force, some jurors might conclude that the defendant used a knife to create the threat; others might conclude he used a gun.  But that disagreement – a disagreement about the means – would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force.[31]

¶28.  Here, the jury was properly instructed that one of the elements of robbery is taking, stealing, and carrying away some "personal property of another."[32]  The facts necessary to prove this element can be shown by alternative fact patterns, but still lead to the conclusion that there was but one offense – that of robbery.  We are satisfied that this jury was perfectly

---

[27]*Id.* at 815.

[28]*Id.*

[29]*Id.*

[30]*Id.* at 823-24.

[31]*Id.* at 817.

[32]Miss. Code Ann. § 97-3-73 (Rev. 2006).

capable of sifting through the evidence presented and was able to discard any factually insufficient theories. We find that there was sufficient evidence to support the taking of the wallet and its contents. By its verdict, twelve jurors unanimously agreed that Fulgham had robbed Joey of personal property. If we were to accept Fulgham's position as embodied in instruction D-48, it could lead to an absurd result. For example, while all twelve jurors might agree that Fulgham had killed Joey and had stolen some of his personal property, acquittal would be required if six believed she had stolen his money and the other six believed she had stolen the CPU. We find this argument to be without merit.

**II.     Whether the trial court erred in overruling Fulgham's objection to the relevance of Vanessa Davis's testimony.**

¶29.    Fulgham argues that the trial court erred in permitting the State to present evidence of a romantic relationship between Fulgham and her brother, Tyler Edmonds. However, we find that Fulgham failed to object contemporaneously.[33] Fulgham objected after Vanessa Davis already had answered the State's questions regarding Fulgham's alleged romantic relationship with her brother.

¶30.    Procedural bar notwithstanding, we address the merits of this claim. We review the admission or exclusion of evidence under an abuse-of-discretion standard.[34] And we find the trial court did not abuse its discretion in allowing the testimony. We find that this testimony

---

[33]*Cole v. State*, 525 So. 2d 365, 369 (Miss. 1987) ("If no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case."); *see also* **Simmons v. State**, 805 So. 2d 452, 468 (Miss. 2001) (noting that this Court has the prerogative to relax the procedural bar in capital cases and address the merits).

[34]**Smith v. State**, 25 So. 3d 264, 269 (Miss. 2009).

14

was at least marginally relevant to explain the relationship between Fulgham and her brother and the controlling influence that Fulgham exerted over him. This issue has no merit.

### III. Whether the trial court erred in overruling hearsay objections concerning Fulgham's purported desire to shoot a dog.

¶31. Fulgham argues that the trial court erred in allowing the jury to hear testimony relating to her alleged statement that she wanted to shoot a stray dog and her requests for a gun to shoot it. Over Fulgham's hearsay objection, Davis testified that about a month prior to Joey's death, Fulgham had complained about a stray dog and had asked Davis for her grandmother's gun to shoot it. Fulgham further objected when the State asked Davis how many times Fulgham had requested the gun, and Davis responded "three times." Fulgham argues that these statements constituted inadmissible hearsay, and if admissible, that their probative value was outweighed by their prejudicial effect.

¶32. Under Mississippi Rule of Evidence 801, hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[35] Fulgham's statement that she wanted to shoot a dog is not hearsay because it was not offered for the truth of the matter asserted.[36] Additionally, Fulgham's statements that she wanted a gun are admissible as admissions by a party opponent under Mississippi Rule of Evidence 801(d)(2)(A). This issue has no merit.

---

[35]Miss. R. Evid. 801(c).

[36]Miss. R. Evid. 801(c).

15

**IV.** **Whether the trial court erred in overruling a hearsay objection concerning Fulgham's purported declaration that her marriage was over.**

¶33. Fulgham argues that the trial court erred in allowing the State's questioning of Davis about Fulgham's relationship with Joey. Davis testified that Fulgham and Joey "were supposed to be getting back together and working things out[,]" and the State then asked Davis, "Okay. But what did Kristi Fulgham tell you?" Fulgham objected on the basis of hearsay, and the trial court overruled the objection. Davis then responded "That, you know, she was – it wasn't going to work out, basically."

¶34. Fulgham admits that her alleged statement to Davis is relevant to the determination of whether she killed her husband, but she then argues erroneously that it constitutes inadmissible hearsay. This testimony was excepted from the prohibition of hearsay, since it was a "statement by the accused, direct or *implied*, of facts pertinent to the issue, and tending, in connection with other facts, to prove [her] guilt."[37] This statement was an admission by a party opponent and not subject to the hearsay rule.[38]

**V.** **Whether the trial court erred in refusing jury instructions D-13B and D-20.**

¶35. Fulgham argues that the trial court erred in refusing to grant her "two-theory instructions" (D-13B and D-20) when it did grant a circumstantial-evidence instruction. We find that *Goff v. State*[39] is dispositive of this issue. In *Goff*, this Court held that it is not

---

[37]*Reed v. State*, 229 Miss. 440, 91 So. 2d 269, 272 (Miss. 1956) (emphasis added).

[38]Miss. R. Evid. 801(d)(2)(A).

[39]*Goff v. State*, 14 So. 3d 625, 662-63 (Miss. 2009).

16

reversible error to refuse a two-theory instruction in a case based purely on circumstantial evidence if the court grants a general circumstantial-evidence instruction.[40]

**VI.    Whether the trial court erred in refusing jury instruction D-54A.**

¶36.    Fulgham argues that the trial court erred in refusing jury instruction D-54A, which reads:

> The court instructs the jury that it is the duty of each and every juror on the panel to make up his own verdict for himself, and to be governed by his own judgment and conscience alone after conferring with his fellow jurors.  If any single juror on this panel, after conferring with his fellow jurors, is not satisfied by the evidence to a moral certainty of the guilt of the defendant, then it is the sworn duty of the said juror to vote not guilty, and never to yield his judgment but firmly stand by it so long as he is not satisfied beyond a reasonable doubt of the defendant's guilt even though every other juror on the panel disagree with him.

The trial court denied the instruction as being repetitive and without foundation in the law. We find the jury was properly instructed that the State had the burden to prove its case beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence.  Further, when all instructions are read as a whole, we agree that proposed instruction D-54A is repetitious of instruction C-11, which reads:

> The verdict of the jury must represent the considered judgment of each juror. In order to return a verdict it will be necessary that each juror agree thereto.  In other words, all twelve jurors must agree on a verdict in this case.  It is your duty as jurors to consult with one another and to deliberate in view of reaching an agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.  In the course of your deliberations do not hesitate to re-examine your own views and change your

---

[40]*Id.* at 662-63 (citing ***Kitchens v. State***, 300 So. 2d 922, 926 (Miss. 1974)).

17

opinion if convinced that it is erroneous, but do not surrender your honest convictions as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

We find that the trial court did not err in excluding D-54A as being repetitive of instructions already granted.

## VII. Whether the trial court erred in granting jury instruction S-5.

¶37. Fulgham argues that the trial court erred in granting jury instruction S-5, which defined the statutory phrase "while engaged in the commission of" to include "the actions of Defendant leading up to the robbery, the actual robbery and/or the flight from the scene of the robbery." Fulgham argues that this instruction confused the jury regarding the State's alternative theories and further distorted the unanimity requirement.

¶38. However, we find this issue to be a proper instruction pursuant to this Court's recent ruling in *Goff v. State*, in which we held:

> . . ."the intent to rob, which is required to prove the underlying felony of robbery, can be shown from the facts surrounding the crime." *Walker v. State*, 913 So. 2d 198, 224 (Miss. 2005) (quoting *Lynch v. State*, 877 So. 2d 1254, 1266 (Miss. 2004)). Mississippi recognizes the "one continuous transaction rationale" in capital cases. *West v. State*, 553 So. 2d 8, 13 (Miss. 1989). We have construed our capital murder statute and held that "the underlying crime begins where an indictable attempt is reached . . . ." *Pickle v. State*, 345 So. 2d 623, 626 (Miss. 1977). "An indictment charging a killing occurring 'while engaged in the commission of' one of the enumerated felonies includes the actions of the defendant leading up to the felony, the attempted felony, and flight from the scene of the felony." *Turner v. State*, 732 So. 2d 937, 950 (Miss. 1999) (quoting *West*, 553 So. 2d at 13).[41]

Therefore, the trial court did not abuse its discretion in granting instruction S-5.

---

[41] *Goff*, 14 So. 3d 625, 649-50 (Miss. 2009).

18

## VIII.  Whether the trial court erred in refusing jury instruction D-13.

¶39.    Jury instruction D-13 reads:

> Each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt.  In other words, before an inference essential to establish guilt may be found to have been proven beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt.

Fulgham argues that the trial court erred in refusing instruction D-13, because the jury was never advised that "stacked" inferences in a circumstantial case must be supported by facts proven beyond a reasonable doubt.  The trial court refused this instruction as being repetitive of Instruction S-2B.  Instruction S-2B instructed the jury as follows:

> The Court instructs the jury that if you find from the evidence in this case beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistant [sic] with innocence, that on or about May 10, 2003, the Defendant, Kristi Fulgham, acting alone or with another, did, unlawfully, willfully, feloniously, with or without the design to effect death, kill Joey Fulgham, a human being, without authority of law and not in necessary self defense, while engaged in the commission of the crime of Robbery, then you shall find the Defendant guilty as charged of capital murder.
>
> If the State has failed to prove any one or more of these elements, then you shall find the Defendant not guilty of capital murder and proceed in your deliberations to consider the lesser included charge of murder.

S-2B instructs the jury that each element of the crime must be proven beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence.  We find this instruction was adequate to guard against the jury convicting Fulgham based on "stacked"

19

inferences. Therefore, the trial court did not err in refusing proposed instruction D-13 as being repetitious.

**IX.  Whether the trial court erred in granting instruction S-3B and in refusing instruction D-51.**

¶40.  Fulgham argues that the trial court should have refused the State's instruction, S-3B, an instruction on the lesser offense of murder. It instructed the jurors to consider the lesser offense of murder only if they first unanimously found the defendant not guilty of capital murder. S-3B reads:

> The Court instructs the Jury that if you unanimously find that the State has failed to prove all the elements of the crime of Capital Murder, you may then proceed in your deliberations to consider the lesser charge of Murder. However, it is your duty to accept the law given to you by the Court; and if the facts and the law warrant a conviction of the crime of Capital Murder, then it is your duty to make such a finding, and not be influenced by your power to find a lesser offense. This provision is not designed to relieve you from the performance of an unpleasant duty. It is included to prevent a failure of justice if the evidence fails to prove the original charge but does justify a verdict for the lesser crime.
>
> Therefore, if you believe from the evidence in this case beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that the Defendant, Kristi Fulgham, acting alone or with another, did on or about May 10, 2003, unlawfully, willfully, and feloniously, of her malice aforethought, kill and murder Joey Fulgham, a human being, without authority of law and not in necessary self defense, then you shall find the Defendant guilty of the lesser included offense of Murder.

Rather than granting S-3B, Fulgham argues the court should have granted instruction D-51, which reads:

> I have instructed you now on the crimes of capital murder and murder.

20

These are distinct crimes.

I instruct you that, if warranted by the evidence, you may find the defendant guilty of a crime lesser than capital murder. However, not withstanding this right, it is your duty to accept the law as given to you by the Court, and if the facts and law warrant a conviction of the crime of capital murder, then it is your duty to make such a finding uninfluenced by your power to find a lesser offense. This provision is included to prevent a failure of justice if the evidence fails to prove the original charge of capital murder but does justify a verdict for the lesser crime of murder.

We previously have considered the State's "acquit-first" instruction and have found that it is not prohibited by the law of this State.[42] In *Gray v. State*, we ruled:

This Court has considered such "acquit-first" instructions before. There is nothing in Mississippi jurisprudence that prohibits such an instruction. *Carr*, 655 So. 2d at 848. Jury "( . . . instructions should be read in their entirety to determine if there was error)." *Walker*, 671 So. 2d at 608 (quoting *Chase*, 645 So. 2d at 852). Gray's claim that the instruction coerces jurors into convicting of capital murder even though they may believe him guilty only of simple murder is unfounded. This Court has held that such a result is not required or warranted from this instruction. *Chase*, 645 So. 2d at 852.[43]

The trial court did not abuse its discretion in granting instruction S-3B and refusing instruction D-51.

**X.     Whether the trial court erred in refusing jury instruction D-18.**

¶41.    Jury instruction D-18 reads: "Guilt by association is neither a recognized nor tolerable concept in our criminal law." Fulgham argues that the trial court should have granted this instruction, as "the State tethered Ms. Fulgham to Tyler Edmonds." However, in reviewing

---

[42]*Gray v. State*, 728 So. 2d 36, 75 (Miss. 1998).

[43]*Id.*

21

the instructions as a whole, we find that the trial court did grant instruction D-9A, which provides in relevant part that "[t]he defendant is not on trial for any act, conduct, or offense not alleged in the indictment [;] neither are you to be concerned with the guilt of any other person not on trial as a defendant in this case." We find the trial court adequately addressed Fulgham's concerns by granting instruction D-9A. Therefore, the trial court did not abuse its discretion in refusing to grant D-18, as it was repetitive of D-9A.

**XI.      Whether the trial court erred in refusing to grant jury instruction D-22.**

¶42.    Fulgham requested that the trial court instruct the jury that:

Each person testifying in this case is a witness. You, individually, must determine the believability of the witnesses. I instruct you that you may consider the following factors in weighing the testimony of a witness:
1. the intelligence of the witness;
2. the ability of the witness to observe and accurately remember;
3. the sincerity, or lack of sincerity, of a witness;
4. the demeanor of the witness;
5. the extent to which the testimony of the witness is supported or contradicted by other evidence;
6. whether discrepancies in testimony are the result of innocent mistake or deliberate falsehood; and
7. any other characteristics noted by you.

I instruct you that you may reject or accept all or any part of the testimony of a witness; or you may reject parts, but accept other parts of the testimony of a witness.

After making your own judgment, give the testimony of each witness the credibility, if any, you think it deserves.

22

This instruction is taken almost verbatim from ***Chatman v. State***.[44]  In ***Chatman***, this Court ruled that Mississippi law supports such an instruction, and that "under certain circumstances the defendant may be entitled to [this] more specific instruction[.]"[45]  But we found that the trial judge did not abuse his discretion in refusing to grant the instruction, since another instruction properly informed the jury "of the things it should consider when weighing witness testimony."[46]

¶43.    In this case, the jury was instructed by instruction C.01 that:

> It is your duty to determine the facts and to determine them from the evidence produced in open court.  You are to apply the law to the facts and in this way decide the case.  You should not be influenced by bias, sympathy, or prejudice. Your verdict should be based on the evidence and not upon speculation, guesswork, or conjecture.
>
> You are the sole judges of the facts in this case.  Your exclusive province is to determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case.  You are required and expected to use your good common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified in this case.

We find the jury was properly instructed under C.01 "of the things it should consider when weighing witness testimony."[47]  While a specific instruction may have been more helpful, we find that the lower court did not abuse its discretion in refusing instruction D-22, as the jury

---

[44]***Chatman v. State***,761 So. 2d 851, 854 (Miss. 2000).

[45]***Id.*** at 852.

[46]***Id.*** at 855.

[47]***Id.***

23

was adequately instructed on this issue when all instructions are viewed as a whole. And we cannot say that the instruction was of "such importance that the court's failure to instruct the jury on that issue seriously impaired the defendant's ability to present his given defense."[48]

**XII.   Whether the trial court erred in refusing jury instructions D-14 and D-15.**

¶44.   Instruction D-14 reads:

> In your deliberations, you are bound to give Kristi Fulgham the benefit of any reasonable doubt of her guilt that arises out of the evidence or want of evidence in this case. There is always a reasonable doubt of a defendant's guilt when the evidence simply makes it probable that the defendant is guilty. Mere probability of guilt will never warrant you to convict Kristi Fulgham. It is only when on the whole evidence you are able to say on your oaths, beyond a reasonable doubt, that the defendant is guilty that the law will permit you to find her guilty. You might be able to say you believe Kristi Fulgham guilty and yet, if you are not able to say on your oath, beyond a reasonable doubt, that she is guilty, it is your sworn duty to find Kristi Fulgham not guilty.

¶45.   And instruction D-15 reads:

> A reasonable doubt may arise not only from the evidence produced but also from a lack of evidence. Reasonable doubt exists when, after weighing and considering all the evidence, using reason and common sense, jurors cannot say that they have a settled conviction of the truth of the charge.

¶46.   These instructions are attempts to define "reasonable doubt." "This Court has long held that a definition of reasonable doubt is not a proper instruction for the jury; '[r]easonable doubt defines itself.'"[49] We find the trial court did not abuse its discretion in denying these two instructions.

---

[48] *Id.* at 854-55.

[49] *Barnes v. State*, 532 So. 2d 1231, 1235 (Miss. 1988) (quoting *Boutwell v. State*, 165 Miss. 16, 143 So. 479, 483 (1932)).

24

**XIII. Whether the trial court erred in transferring venue to Union County.**

¶47.   Fulgham filed a motion to change venue based on the pervasive media attention to her trial and the trial of her codefendant, Tyler Edmonds.[50]  In her motion, Fulgham asserted that the court should transfer venue to a county with at least the same population of black citizens as Oktibbeha County.  She further argued that the counties adjoining Oktibbeha County were tainted as a result of the media coverage by the Starkville, Columbus, and Tupelo media outlets.  She requested that the trial court transfer venue to Attala, Grenada, Madison, or Warren County.

¶48.   After a hearing on the motion to transfer venue, at which the State asserted that it had no objection to a change of venue outside Oktibbeha County, the court granted the motion.  But it reserved ruling on a particular county until "suitability and availability" were determined.  Thereafter, the trial court ordered that the jury should be drawn from Union County, and Fulgham filed an objection to this county.  In her objection, Fulgham argued that the Tupelo media provides Union County with news coverage, and therefore, the transfer did not remedy the taint.  She further argued that the racial demographics of Union County were not comparable to Oktibbeha County.[51]

---

[50]Fulgham attached seventy-four exhibits to her motion to change venue.  These exhibits consisted of seventy-one newspaper clippings, two video tapes of the news coverage, and three affidavits.

[51]Fulgham attached an exhibit of the 2000 Census which showed that Oktibbeha County is 59.2% white and 37.7% black, and Union County is 84% white and 15.2% black.

¶49. The court held a hearing on Fulgham's objection to transfer venue to Union County, and she presented no argument but stood on her written motions. The State argued that Fulgham had no right to change venue to a county of similar racial demographics, and that there is no requirement that a court transfer out of the original media market. The trial court ruled that race was not at issue in the case, and that it failed to see the relevance of racial demographics. The trial court further ruled that there was no reason to believe that the citizens of Union County would not apply the law as instructed. The court also noted that it had checked with three other counties for availability prior to contacting Union County, and it overruled Fulgham's objection.

¶50. On appeal, Fulgham argues that the trial court erred in refusing to transfer venue to another county, and such error deprived her of the right to a fair and impartial jury which represented a cross-section of the Okitibbeha County community. "This Court reviews a trial court's decision to grant or deny a change of venue for abuse of discretion."[52] Further, "the accused has a right to a change of venue when it is doubtful that an impartial jury can be obtained; such doubt is implicit when there is present strong public sentiment against the defendant[.]"[53]

¶51. We find the trial court did not abuse its discretion in denying Fulgham's objection to transferring the case to Union County. Only eleven jurors of the venire responded that they

[52] *Ruffin v. State*, 992 So. 2d 1165, 1174 (Miss. 2008).

[53] *Johnson v. State*, 476 So. 2d 1195, 1210-11 (Miss. 1985).

had heard or seen pretrial publicity related to Fulgham's and/or Tyler Edmonds's trial. None of these potential jurors was seated on the jury. Therefore, Fulgham's argument that she failed to receive a fair and impartial trial has no merit.

¶52.    We further find that *Simon v. State* is dispositive of Fulgham's argument regarding her right to change venue to a county of similar demographics.[54] In *Simon*, the trial court granted the defendant's motion to change venue based on widespread publicity in Quitman County.[55] However, the defendant objected to the trial court's transfer of venue to Jones County, because twenty-one percent of the registered voters in Jones County were African-American compared to fifty-four percent in Quitman County.[56] On appeal, this Court held that the defendant had no right to a change of venue to a jurisdiction with racial demographics similar to those in the county where the offense occurred.[57] he Court ruled that "[n]othing in our constitutions, statutes, or case law gives a criminal defendant the right to obtain a venue of his choosing by making repeated motions for a change of venue."[58] Under this Court's holding in *Simon*, this assignment of error fails.

**XIV.   Whether the cumulative error in this case warrants reversal.**

---

[54]*Simon v. State*, 633 So. 2d 407 (Miss. 1993), *vacated on other grounds*, 513 U.S. 956, 115 S. Ct. 413, 130 L. Ed. 2d 329 (1994).

[55]*Id.* at 411.

[56]*Id.* at 412.

[57]*Id.*; *see also* *De La Beckwith v. State*, 707 So. 2d 547, 596-97 (Miss. 1997) (discussing *Simon v. State*, 633 So. 2d 407 (Miss. 1993)).

[58]*Simon*, 633 So. 2d at 412.

¶53.    Fulgham argues that the aggregate error warrants reversal under state and federal law.

We find that Fulgham has failed to set forth any error as to the guilt phase.

*Sentencing Phase*

**XV.    Whether the trial court erred in excluding the mitigation testimony of Adrienne Dorsey-Kidd, an expert in the field of social work.**

¶54.    The admission of expert testimony is within the sound discretion of the trial court, and

this Court will review the trial court's decision to admit or deny expert testimony under an

abuse-of-discretion standard.[59]

¶55.    Fulgham argues that the trial court erred in excluding the testimony of Dorsey-Kidd

after the court accepted the witness as an expert in the field of social work.  Fulgham argues

that the State failed to object in a timely manner to Dorsey-Kidd's proposed testimony when

the State objected *after* it had conceded Dorsey-Kidd could testify regarding her opinions as

a social worker.  In support of her argument, Fulgham asserts that she timely gave notice to

the State of her expert witness and offered Dorsey-Kidd's proposed testimony via an expert

report.  Fulgham further notes that the State failed to object (knowing the substance of

Dorsey-Kidd's proposed testimony) when her trial counsel informed the jury during opening

statement that it would hear from Dorsey-Kidd, a licensed social worker who had completed

---

[59]***Bishop v. State***, 982 So. 2d 371, 380 (Miss. 2008).

an intensive social history of Fulgham. Fulgham argues that the trial court's ruling deprived the jury from hearing *all* relevant mitigation evidence.[60]

¶56.    During the sentencing phase, Fulgham called four mitigation witnesses: Mark Webb, a pyschiatrist; Carol Morgan, Fulgham's mother; Sarah Ferguson, Fulgham's long-time friend; and Adrienne Dorsey-Kidd, a licensed certified social worker. Webb testified that he had performed a psychiatric assessment of Fulgham at the Oktibbeha County Jail. He testified that Fulgham suffered from post-traumatic stress disorder and panic disorder with dependent personality traits. In arriving at these diagnoses, Webb testified that he had based his opinion on information from Fulgham, namely: (1) Fulgham was raped by her biological father when she was eleven years old; (2) one of her stepfathers was an alcoholic who had abused her mother; (3) and one of her mother's boyfriends had neglected her.

¶57.    Carol Morgan testified that Fulgham's biological father was absent during her infancy and that he never had paid child support. Morgan also testified about their frequent moves, and that she was married and divorced several times, in addition to having various male friends with whom she and Fulgham had lived throughout Fulgham's formative years. She also stated that two of her husbands had been abusive alcoholics.

---

[60]Fulgham also filed a motion for a new trial or in the alternative for new sentencing hearing in which she argued the trial court erroneously had excluded Dorsey-Kidd as an expert. In support of this motion, she attached affidavits, one from a social worker and one from a capital-defense attorney (respectively, Jill Miller and David Bruck), who asserted that Dorsey-Kidd's proposed testimony was the type of mitigation regularly admitted at the sentencing phase.

¶58. Sarah Ferguson testified that Fulgham often came over to her house as a teenager because Fulgham's stepfather was "scary and mean." She also introduced various pictures of Fulgham's children and testified that Fulgham was a good mother, and her children were important to her.

¶59. Prior to Fulgham calling Adrienne Dorsey-Kidd, the State objected to her testimony, asserting: "She is a licensed social worker. She is not a psychiatrist, a psychologist, and I don't believe – and everything she would be testifying to would be hearsay, and I'd like to object to any testimony that she has at this time." The court overruled this objection. Fulgham then called Dorsey-Kidd and questioned her regarding her qualifications as a licensed social worker. When Fulgham tendered Dorsey-Kidd as an expert in the field of social work, the State asked the court whether Dorsey-Kidd was being accepted "strictly in the area of social work . . . not psychiatry or psychology." The court answered in the affirmative, and the State responded "No objection to social work[.]" And she was accepted by the court as an expert in the field of social work.

¶60. Dorsey-Kidd testified that she had been hired to complete an intensive social history of Fulgham, which had involved reviewing documents, interviewing numerous people, and three meetings with Fulgham. The State then objected when Dorsey-Kidd was asked: "Ms. Kidd, did you reach any conclusions or make any observations in completing your intensive social history?" The State argued that "Ms. Kidd is not authorized to give any opinions in the areas set forth in her report. She is a social worker, she is not a psychiatrist or a

psychologist."  The court sustained the objection and allowed Fulgham to make an offer of proof outside the presence of the jury.

¶61.    In her proffer, Dorsey-Kidd testified to four "observations" that she had made: (1) lack of parental bonding; (2) substance abuse by Carol Morgan and at least two of Fulgham's stepfathers; (3) lack of a biological father's input; and (4) the love that Fulgham had for her children and vice versa after three years of incarceration.  The court ruled that Dorsey-Kidd's testimony was not of such a high degree of expertise and skill that it was outside the knowledge of a lay person, and that the jury could arrive at these conclusions based on the evidence already admitted.  The court did allow Dorsey-Kidd to introduce into evidence drawings, cards, and letters made by Fulgham's children.

¶62.    In objecting to Dorsey-Kidd's testimony, the State presented no argument or evidence that Dorsey-Kidd's testimony was outside the field of social work.  And its objection based on hearsay is unfounded.   We note that under Mississippi Rule of Evidence 703, an expert such as Dorsey-Kidd may form an opinion based on facts or data not admissible in evidence "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject[.]"[61]   And due process requires that all evidence relied upon at sentencing, including expert testimony, be relevant and reliable,[62] a rule which is reflected by Mississippi Rule of Evidence 702:

---

[61]Miss. R. Evid. 703.

[62]*See* **Green v. Georgia**, 442 U.S. 95, 96, 99 S. Ct. 2150, 60 L. Ed. 2d 738 (1979); **Williams v. State of Oklahoma**, 358 U.S. 576, 584, 79 S. Ct. 421, 3 L. Ed. 2d 516 (1959).

31

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[63]

¶63. Further, the proffered testimony was offered as mitigation, and mitigating evidence is "admissible if it relates to the character and background of the defendant and the circumstances surrounding the crime[.]"[64] The evidence must be relevant to one or more of these factors.[65] "Where the sentencer is not permitted to consider all mitigating evidence, there is a risk of 'erroneous imposition of the death sentence,' and the case will be remanded for resentencing."[66]

¶64. Dorsey-Kidd's proposed testimony would have provided the jury with additional observations and a cohesive overview of the mitigation evidence presented by the other three witnesses. Her expert testimony would have focused on Fulgham's social history and the social context of the crime. We find Dorsey-Kidd's testimony was especially relevant, since she had reviewed various documents and had conducted interviews prior to offering her expert

---

[63]Miss. R. Evid. 702.

[64]*Eskridge v. State*, 765 So. 2d 508, 511 (Miss. 2000) (citing *Tuilaepa v. California*, 512 U.S. 967, 976, 114 S. Ct. 2630, 2637, 129 L. Ed. 2d 750, 762 (1994)).

[65]*Id.*

[66]*Wilcher v. State*, 697 So. 2d 1123, 1133 (Miss. 1997) (citing *Mills v. Maryland*, 486 U.S. 367, 375, 108 S. Ct. 1860, 1866, 100 L. Ed. 2d 384 (1988) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 117, 102 S. Ct. 869, 878, 71 L. Ed. 2d 1 (1982))).

32

observations and/or opinions. Additionally, Dorsey-Kidd was the only mitigation witness who had based her findings on interviews with multiple people, including Fulgham.

¶65. We also find merit in Fulgham's argument that any prejudice was compounded by the timing of the State's objection. Prior to trial, the State had notice of Dorsey-Kidd's proposed testimony, and without objection, heard Fulgham's counsel inform the jury that it would hear testimony from this expert. While the State was not required to object prior to the time it did, it appears from the record that the timing of its objection exacerbated the error.

¶66. In the sentencing phase of a capital murder trial, the stakes are life and death. A defendant is permitted to introduce virtually any relevant and reliable evidence touching upon the defendant's background and character, or the crime itself, which is offered as a basis to persuade a jury to return a sentence of less than death. We caution prosecutors and trial judges about limiting mitigation evidence offered by a defendant when it is presented fairly, and is relevant to the defendant's character, background, or the circumstances surrounding the crime.

¶67. We find the trial court abused its discretion in refusing to allow Dorsey-Kidd to testify to her opinions and observations after accepting her as an expert in the field of social work, and we are unable to say that such an error did not affect the jury's ultimate decision. We conclude that the exclusion of this evidence denied Fulgham a fair sentencing phase and

33

warrants reversal as to sentencing, since the jury was prevented from considering all relevant

mitigating evidence.[67]

¶68.    Although we find this issue to be dispositive, warranting reversal for another

sentencing hearing, we will address those issues raised by Fulgham that are likely to recur on

resentencing.

### XVI.    Whether the court committed reversible error by allowing the jury to consider pecuniary gain and robbery as separate and distinct aggravators.

¶69.    By statute, the Legislature has limited the aggravators the State can attempt to prove

at sentencing.  Mississippi Code Section 99-19-101 provides in relevant part that:

> Aggravating circumstances shall be limited to the following: . . . . (d) The capital offense was committed while the defendant was engaged in, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery[.] . . . . (f) The capital offense was committed for pecuniary gain.[68]

Over Fulgham's objection, the court allowed the jury to consider both the robbery and the

pecuniary-gain aggravators.    Fulgham argues that the felony-murder aggravator is

unconstitutionally duplicative and that the indictment failed to list the aggravators.  We

quickly dispose of this second argument, since this Court repeatedly has held that the use of

---

[67]*Wilcher v. State*, 697 So. 2d 1123, 1133 (Miss. 1997) (citing *Mills v. Maryland*, 486 U.S. 367, 375, 108 S. Ct. 1860, 1866, 100 L. Ed. 2d 384 (1988) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 117, 102 S. Ct. 869, 878, 71 L. Ed. 2d 1 (1982))).

[68]Miss. Code Ann. § 99-19-101(5)(d), (f) (Rev. 2007).

34

an underlying felony as an aggravating factor is constitutional and that an indictment of capital murder does not have to list the statutory aggravators.[69]

¶70. In *Ladner v. State*, the Court held that "where the indictment charges a robbery/murder capital offense and robbery is designated as an aggravating circumstance, pecuniary gain should not be used as an aggravating circumstance *unless clearly supported by the evidence*."[70] In *Willie v. State*, the Court extended its holding in *Ladner* and ruled:

> Today, we go one step further. Not only should the two aggravators not be given as separate and independent aggravators *when they essentially comprise one, they may not be given*. When life is at stake, the jury cannot be allowed the opportunity to doubly weigh the commission of the underlying felony and the motive behind the underlying felony as separate aggravators.[71]

¶71. The purpose of this holding is to minimize those cases in which the same conduct will support multiple aggravators. In this case, the relevant inquiry is whether the evidence supported a finding that Fulgham had committed the murder in the expectation that she would receive some pecuniary gain separate and apart from the robbery proceeds. We find that there was evidence to support the pecuniary-gain aggravator for conduct distinct and separate from the robbery-murder aggravator. First, as to the robbery aggravator, the State presented evidence that Joey's wallet had been stolen. Shannon Fulgham testified that he saw Joey cash

---

[69]*See* **Goff v. State**, 14 So. 3d 625, 655 (Miss. 2009); **Brawner v. State**, 947 So. 2d 254, 265 (Miss. 2006).

[70]**Ladner v. State**, 584 So. 2d 743, 763 (Miss. 1991) (emphasis added).

[71]**Willie v. State**, 585 So. 2d 660, 680-81 (Miss. 1991) (emphasis added), *overruled on other grounds by* **King v. State**, 784 So. 2d 884 (Miss. 2001).

his paycheck for approximately $1,020 and place the money in his wallet on Friday (the day before the murder). He further testified that Joey had always carried a wallet. Kyle Harvey testified that, on their Coast trip (which began on the day of the murder), Fulgham paid for everything – food, souvenirs, and hotel room – with cash, even though she was unemployed at the time. Therefore, the State presented evidence in support of the robbery aggravator: Joey's missing wallet (and its contents).

¶72. The State also introduced evidence of the pecuniary-gain aggravator in support of its theory that Fulgham's motive for the murder was to collect life-insurance proceeds. Scotty Carrithers, who in 2003 handled life-insurance records for the National Guard, testified that Fulgham had called him and inquired as to the amount of Joey's life-insurance policies. Scotty testified that he had refused to release the information to Fulgham, but that Fulgham was the beneficiary of a $55,000 policy. Scotty also testified that Fulgham once was the beneficiary of a second policy worth $255,000, but that Joey had changed the beneficiary to his mother. Fulgham's biological father also testified that she had told him "I want him dead, and that he has a life insurance policy, and . . . the kids would get $300,000, and I would get $200,000. And that she would buy me – I would look good sitting in a Cadillac, if I would keep my mouth shut." We find sufficient evidence existed to support the pecuniary-gain aggravator.[72]

---

[72]*See also* **Byrom v. State**, 863 So. 2d 836, 881 (Miss. 2003) (finding sufficient evidence existed to support the instruction of the pecuniary-gain aggravator in a capital murder case where defendant planned to pay off house and car and promised to pay trigger-man money from decedent's life-insurance proceeds).

**XVII. Whether the trial court committed constitutional error in denying Fulgham's motion to suppress her June 2, 2003, custodial statement**.

¶73. Fulgham provided the police two custodial statements[73] on two different occasions: May 12, 2003, and June 2, 2003. Fulgham concedes that the State did not introduce or mention either statement during the guilt phase. Neither statement was admitted into evidence during the sentencing phase, but was used to cross-examine a witness. Fulgham's assignment of error concerns only the second statement.

¶74. The court held a suppression hearing on March 18, 2006, and heard testimony regarding the voluntariness of the June 2, 2003, statement. George Carrithers, chief deputy of the Oktibbeha County Sheriff's Office, testified that at Fulgham's request, he had spoken with her on June 2, 2003. The record is unclear as to the starting time of this statement, but a transcript of the recording shows that Carrithers had Fulgham sign the following waiver at the beginning of her statement, which was some time prior to 2:45 p.m.:

> I, Kristi Fulgham, have this day, June 2, 2003, requested to speak to Deputy George Carrithers of the Oktibbeha County Sheriff's Department. It is my decision to speak to Deputy Carrithers and I have initiated the interview. No one has asked me to speak to Deputy Carrithers. I understand that I have an attorney and I also understand that I have the right to have my attorney, Stephanie Mallette present during any interview I give to Deputy Carruthers.
>
> However, I choose to waive my right to have my attorney present and I am making this decision to speak to Deputy Carrithers knowingly, voluntarily and intelligently and of my own free-will.

---

[73]In each statement, Fulgham stated that her brother, Tyler Edmonds, had shot and killed Joey.

Deputy Carrithers proceeded to record Fulgham's statement, and at 2:55 p.m. (at her request) Fulgham took a polygraph test. Fulgham continued her statement at 4:45 p.m. Emily Britt, a secretary with the Sheriff's office, and Eddie Young, the jail's administrator, witnessed Fulgham's statement and corroborated Deputy Carrithers's testimony.

¶75. As a courtesy, one of the deputies called Stephanie Mallette, Fulgham's counsel, and informed her that Fulgham had requested a polygraph. Mallette testified that she had instructed the deputy not to administer the polygraph. Mallette stated that she had arrived at the jail at 2:45 p.m. and was denied access to her client. According to Mallette, the deputy informed her the polygraph already had begun.

¶76. Fulgham argues the trial court erred in refusing to suppress the June 2, 2003, statement when the State used it to cross-examine Dr. Webb at the sentencing phase. Fulgham argues that the Sixth Amendment confers a bilateral, post-attachment right to counsel. In other words, Fulgham argues that her attorney can invoke the right to counsel on behalf of her client, Fulgham. Fulgham asserts that her right to counsel and the Due Process Clause of the Fourteenth Amendment were violated when the police refused to allow Mallette access to her. Therefore, Fulgham argues that the trial court erred in not suppressing that portion of her statement that occurred at and after 2:45 p.m., the time at which Mallette had arrived at the jail requesting to speak with her client.

38

¶77. A trial court's finding that a defendant's statements were voluntarily given cannot be reversed unless the court applied an erroneous legal standard or was clearly erroneous in its findings of fact.[74] This Court has held the following regarding a defendant's right to counsel:

> An accused, after expressing a desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police. ***Edwards v. Arizona***, 451 U.S. 477, 484-485, 101 S. Ct. 1880, 1885, 68 L. Ed. 2d 378, *reh'g denied* 452 U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981). Once the right to counsel has attached, and the accused asserts the right, he is protected from further police-initiated interrogation. ***Michigan v. Jackson***, 475 U.S. 625, 634-636, 106 S. Ct. 1404, 1410-1411, 89 L. Ed. 2d 641-642 (1986).[75] *Even if an accused has procured an attorney, the accused may still waive the right to have the lawyer present during any police questioning. Nothing in the Sixth Amendment prevents a suspect charged with a crime and represented by counsel from voluntarily choosing, on his own, to speak with police in the absence of an attorney. Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will. See **Michigan v. Harvey**,* 494 U.S. 344, 110 S. Ct. 1176, 108 L. Ed. 2d 293 (1990).[76]

In line with this Court's ruling in ***Mettetal***, we find that Fulgham voluntarily initiated the questioning and waived the right to have her attorney present during questioning. We find no merit in Fulgham's constitutional arguments. Therefore, the trial court not was not clearly erroneous in refusing to suppress the statement.

---

[74]***Mettetal v. State***, 602 So. 2d 864, 868 (Miss. 1992).

[75]*Overruled on other grounds by **Montejo v. Louisiana***, 129 S. Ct. 2079, 173 L. Ed. 2d 955 (2009).

[76]***Id***. (emphasis added).

## XVIII. Whether the trial court erred in refusing jury instructions D-77A and D-77B in the jury charge.

¶78.    Fulgham argues that the court erred in refusing jury instructions D-77A and D-77B at the sentencing phase when it granted a circumstantial-evidence instruction at the guilt phase.

Instruction D-77A reads:

> The Court instructs the jury that if the State has relied on circumstantial evidence to establish an aggravating circumstance, then the evidence for the State must be so strong as to establish the aggravating circumstance not only beyond a reasonable doubt, but must exclude every other reasonable hypothesis other than establishment of the aggravating circumstance.
>
> Put differently, all of the facts and circumstances, taken together, must be inconsistent with any reasonable theory or conclusion other than the existence of the aggravating circumstance. All of the facts and circumstances, taken together, must establish to your satisfaction the existence of the aggravating circumstance beyond a reasonable doubt.

¶79.    And instruction D-77B reads:

> During the penalty phase, I instruct you that if there be a fact or circumstance in this case which is susceptible of two interpretations, one favorable and the other unfavorable to Ms. Fulgham and if, after considering all the other facts and circumstances, there is a reasonable doubt regarding the correct interpretation, then you must resolve such doubt in favor of Ms. Fulgham and place upon such fact or circumstance the interpretation most favorable to Ms. Fulgham.

¶80.    Contrary to Fulgham's argument, we have held that a defendant (under the proper circumstances) is entitled to a circumstantial-evidence instruction at the *guilt* phase.[77] We find no authority to support such an instruction at sentencing. We find the trial court did not abuse

---

[77]*See* **King v. State**, 960 So. 2d 413, 446 (Miss. 2007).

its discretion by excluding these circumstantial-evidence instructions from the jury's consideration at the sentencing phase.

**XIX. Whether the trial court erred in refusing instruction D-64 in the jury charge.**

¶81.  Jury instruction D-64 reads as follows:

> You have found Ms. Fulgham guilty of capital murder. You must now decide the appropriate punishment in this case.
>
> Before I instruct you on specific matters regarding Ms. Fulgham's sentence, I will instruct you on the general principles that will govern your deliberations in this sentencing phase. In explaining your duties, I must offer as complete an explanation as possible concerning the legal matters that must govern your deliberations. I cannot stress to you enough that the focus of your deliberations during this phase is not the same as in an ordinary case. Punishment by death is a unique punishment. It is final. It is irrevocable. You must render a decision based on the evidence free from anger and prejudice.

Fulgham argues the trial court erred in refusing this instruction "[b]ecause this *is* a case where the State sought and secured death, [and] it *is* different from cases where the State either does not seek death or is unsuccessful in its quest." But Fulgham concedes that no caselaw mandates that the trial court grant this instruction.

¶82.  In ***Thorson v. State***, this Court considered a similar instruction to the one at issue in this case.[78] In ***Thorson***, the trial court denied jury instruction DS-6, which included the following language: "The death penalty is a unique punishment. It is final and irrevocable. You must render a decision based on the evidence free from passion and prejudice."[79] On

---

[78] ***Thorson v. State***, 895 So. 2d 85, 109 (Miss. 2004).

[79] ***Id.***

41

appeal, this Court found the issue to be procedurally barred, since the defendant had failed to cite any relevant authority to support instruction DS-6.[80] But the Court addressed the merits, and held that the trial court properly had excluded the jury instruction, because the jury had been properly instructed that it should "'consider and weigh any aggravating and mitigating circumstances . . . [but that it should not be] swayed by mere sentiment, conjecture, sympathy, *passion*, *prejudice*, public opinion or public feeling.'"[81]

¶83.   Like the issue in ***Thorson***, this issue is procedurally barred, as Fulgham fails to cite any relevant authority in support of this instruction. Procedural bar notwithstanding, we find that our discussion in ***Thorson*** is applicable. The language rejected in ***Thorson*** closely tracks jury instruction D-64. Further, the trial court instructed the jury to "objectively consider the detailed circumstances of the crime . . . as well as the character of the Defendant herself [and] not to be swayed by mere sentiment, conjecture, passion, sympathy, prejudice, public opinion, or public feeling." The trial court also instructed the jury regarding its consideration of aggravating and mitigating circumstances. We find no merit in this issue.

## CONCLUSION

¶84.   We affirm Fulgham's conviction of capital murder. We reverse her sentence of death and remand this case to the Oktibbeha County Circuit Court for a new sentencing hearing consistent with this opinion.

---

[80]***Id.*** at 110.

[81]***Id.***

42

¶85.   **CONVICTION OF CAPITAL MURDER, AFFIRMED.   SENTENCE OF DEATH, REVERSED AND REMANDED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, RANDOLPH, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.   RANDOLPH, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY LAMAR, J. KITCHENS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, J.**

**RANDOLPH, JUSTICE, SPECIALLY CONCURRING:**

¶86.   I fully concur with the Majority Opinion, but write separately to register respectfully my concern with the separate specially concurring opinion, which, *sua sponte*, raises an issue not presented for our consideration.  *See **Glover v. Jackson State Univ.***, 755 So. 2d 395, 398 n.1 (Miss. 2000) ("this Court has long held that issues not raised on appeal are procedurally barred from consideration"); Luther T. Munford, *Mississippi Appellate Practice*, § 3.7 at 3-24 (2006) (citing ***Educ. Placement Servs. v. Wilson***, 487 So. 2d 1316, 1320 (Miss. 1986)) (discussing the sound principle of judicial administration that this Court generally will avoid considering issues not first presented to and decided by the trial court). Nor is the opposing party granted an opportunity to present argument in opposition.  It shall come as a great surprise if the appellate counsel for Fulgham's post-conviction-relief motion will not present the issue, having received this instruction on advocacy from such an esteemed jurist as Justice Kitchens.  I decline to join in offering such advice, as I fully expect this litigant will appear before this Court again.  A jurist should adjudicate, not advocate.  In resolving disputes presented for adjudication, we should neither favor, nor offer advice to, an accused or the State.

**LAMAR, J., JOINS THIS OPINION.**

**KITCHENS, JUSTICE, SPECIALLY CONCURRING:**

¶87.   I agree with the majority's finding that the trial court abused its discretion in refusing to allow the social worker to testify to her opinions and observations after its acceptance of her as an expert in the field of social work, and that such error warrants reversal of the death sentence.   However, I write separately to address the insufficiency of the indictment, the insufficiency of the evidence with respect to the crime of robbery, and the insufficiency of the jury instructions on robbery.

¶88.   The capital murder charge against Fulgham required the State to prove that she committed a robbery and a murder during the course of a robbery.  Miss. Code Ann. § 97-3-19(2)(e)(Rev. 2006).  The State claimed she robbed her husband in the house where they both lived.  To obtain a conviction, the State was required to prove, beyond a reasonable doubt, that Fulgham had used force or threat of force intentionally to take and carry away her husband's property from his person or presence.  *Crocker v. State*, 272 So. 2d 664, 665 (Miss. 1973).  The indictment accused Fulgham of taking her husband's property, but it did not identify what property she is alleged to have taken.  Instead, the State waited until the trial to disclose to the jury, and to Fulgham, what property it claims she stole from her husband.

¶89.   This case provides an excellent example of why, in a robbery prosecution, due process of law requires that an indictment identify the property the accused is alleged to have taken. The State was required to prove that Fulgham committed a robbery, but she appeared at trial without knowing what property she was accused of stealing.  In fact, neither the indictment,

44

the prosecutor, the trial court, nor the jury has ever been informed of what property she was convicted of taking. To this day, she does not know, and neither does this Court.

¶90. In closing argument, the State suggested it might have been a computer that appeared to have been missing from the house.[82] Or, perhaps some money belonging to her husband was stolen, according to the prosecutor. But Fulgham and her husband were living together in the house. So the computer, assuming there was one – no evidence was adduced that there was a computer available to be stolen – certainly could have belonged either to Fulgham or her husband, or to both. The State offered no proof either way. The jury could not have concluded that Fulgham unlawfully took her husband's computer without some proof that the computer, in fact, was not hers. Such a finding, without any proof, would require pure speculation, and it certainly could not have been proven beyond a reasonable doubt. And as for the money, the State offered no proof that the money found on Fulgham belonged to her husband. Again, the jury was required to speculate.

¶91. But the important point is that, because the indictment did not identify the property Fulgham was alleged to have stolen, she was required to appear at trial and defend the State's claim that she had stolen something, even though she was not told what it was. Had the indictment identified the alleged stolen property, she would have had a fair opportunity to defend the charge. For instance, if the indictment had informed her that the alleged stolen

---

[82]There was very minimal proof that a computer was stolen – only indentations in the carpet where a computer might have been.

property was a computer (as the prosecutor suggested in closing argument), she perhaps could have produced a receipt or other evidence showing it actually belonged to her.

¶92. This Court has held that "[i]n the context of capital murder, . . . a bare allegation of robbery in an indictment, without further specification of the facts in support of that, is sufficient." *Berryhill v. State*, 703 So. 2d 250, 256 (Miss. 1997) (citing *Mackbee v. State*, 575 So. 2d 16, 35 (Miss. 1990)). *See also Bullock v. State*, 391 So. 2d 601, 606 (Miss. 1980); *Bell v. State*, 360 So. 2d 1206, 1208-09 (Miss. 1978). I respectfully disagree with this analysis. A careful look at these cases reveals that this conclusion is based on the interpretation of a statute, specifically Mississippi Code Section 99-17-20. However, it is our state and federal constitutions, above all else, that govern the requirements of an indictment, specifically the right to due process of law and the right "to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. *See also* U.S. Const. amend. XIV; Miss. Const. art. 3, §§ 14, 26.

¶93. Mississippi Code Section 99-17-20 (Rev. 2006) provides, in relevant part,

> Any conviction of the accused for an offense punishable by death shall not be valid unless the offense for which the accused is convicted shall have been set forth in the indictment by section and sub-section number of the Code which defined the offense allegedly committed by the accused.

This Court has relied on this language to hold that an indictment for capital murder, where the killing was committed while engaged in the commission of one of those felonies enumerated in Mississippi Code Section 97-3-19(2)(e), need not describe the underlying felony. *Mackbee*, 575 So. 2d at 35; *Bullock*, 391 So. 2d at 606; *Bell*, 360 So. 2d at 1208-09. These

46

holdings conflict with this Court's well-established rule that any citation to a code section cannot properly charge a crime, and that it is the language of the charging document that informs a defendant of the specific crime he or she is alleged to have committed. *Golden v. State*, 968 So. 2d 378, 386 (Miss. 2007); *Pearson v. State*, 248 Miss. 353, 358-59, 158 So. 2d 710, 712 (1963); *Dendy v. State*, 224 Miss. 208, 213, 79 So. 2d 827, 829 (1955).

¶94.    A proper indictment provides protection of one's due process right to adequate notice of the crime the accused is alleged to have committed. *Jefferson v. State*, 556 So. 2d 1016, 1020 (Miss. 1989). *See also* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation."); Miss. Const. art. 3, § 26 (1890) ("In all criminal prosecutions the accused shall have the right . . . to demand the nature and cause of the accusation."). Further, "from the earliest colonial days in this country it has been the settled rule that a formal accusation is an essential condition precedent to a valid prosecution for a criminal offense." *Woods v. State*, 27 So. 2d 895, 896-897 (Miss. 1946). The *Woods* Court further opined that an indictment is:

> first to furnish the accused such a description of the charge against him as will enable him to prepare his defense and avail himself of the conviction or acquittal against further prosecution for the same offense, and, second to inform the court of the facts alleged, so that it may be able to say whether the facts are sufficient in law to support a conviction if one should be had.

*Id.* at 897. Citation to a statute, as our Code Section 99-17-20 requires, informs the accused of the *nature* of the accusation; but it does not inform him or her of the *cause*, i.e., "you committed a robbery [the cause], and here's what robbery you committed [the cause]."

47

¶95.  The indictment under which Fulgham was charged did not provide her an accurate description of the charge against her so that she could adequately prepare her defense.  The three elements of robbery are (1) intentional (2) taking and carrying away of another's property from his person or presence (3) effectuated by force or threat of force, *Crocker v. State*, 272 So. 2d 664, 665 (Miss. 1973), and every element of a criminal statute must be properly pled and sufficiently proven in order to permit conviction thereunder.  *Taggart v. State*, 957 So. 2d 981, 985-86 (Miss. 2007) (quoting *Carr v. State*, 208 So. 2d 886, 889 (Miss. 1968)).  The indictment did not describe the underlying crime of robbery, but simply alleged that Kristi Fulgham did:

> unlawfully, wilfully, and feloniously, with or without the design to effect death, kill and murder Joey Fulgham, a human being, without authority of law and not in necessary self defense, while engaged in the commission of the crime of Robbery, in violation of Section 97-3-19(e) [sic] MCA (1972) . . . .

Fulgham was never put on notice of what personal property she was alleged to have taken, or from whom the property was taken, or that the property was taken "by force or threat of force."  *Crocker*, 272 So. 2d at 665; Miss. Code Ann. § 97-3-73 (Rev. 2006).  Indeed, were Fulgham charged with robbery alone, the indictment would fall woefully short.

¶96.  Moreover, the indictment does not even meet the basic requirements of Mississippi Code Section 99-17-20, discussed above, because it does not "set forth in the indictment by section and sub-section number of the Code which defined the offense allegedly committed by the accused."  The indictment references "Section 97-3-19(e)," but the proper citation is 97-3-19(2)(e).  Further, in violation of Section 99-17-20, it does not cite any robbery statute;

48

and this charge, under the State's apparent theory of the case, is not a capital offense, absent robbery.

¶97.   Indictments must contain a "plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation."  URCCC 7.06.  *See also* U.S. Const. amends. VI, XIV; Miss. Const. art. 3, §§ 14, 26.  Despite our prior cases to the contrary, the indictment in the present case could not have satisfied these constitutional requirements.

¶98.   Furthermore, the jury was not instructed as to what property Fulgham is alleged to have stolen.  Incredibly, the only clue came from the prosecutor's closing argument.  Thus, it is my opinion that the indictment was insufficient, the proof of robbery was insufficient, and the jury instruction on robbery was insufficient.

¶99.   None of these issues was raised on appeal.  However, Fulgham's appellate counsel was the same as her trial counsel, so she will have an opportunity (should she so desire) to raise the issues in a properly filed petition for post-conviction relief.

¶100.  For the reasons stated, I specially concur.

**DICKINSON, J., JOINS THIS OPINION.**

49